Jerome G. LeMENSE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–2025.

Court of Appeals of Alaska.

April 22, 1988.

Rehearing Denied May 6, 1988.

2. We express no opinion as to whether this would be the appropriate percentage to apply absent this stipulation.

William P. Bryson, and Walter Share, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Jerome G. LeMense was indicted for misconduct involving a controlled substance in the third degree, possession of cocaine with intent to deliver. AS 11.71.030(a)(1). LeMense was convicted, based upon his plea of *nolo contendere,* which was conditioned on LeMense's right to appeal certain issues. *See Cooksey v. State,* 524 P.2d 1251 (Alaska 1974). We affirm.

## FACTS

The facts of the case do not appear to be significantly in dispute. Superior Court Judge Victor D. Carlson set out the following facts in his Memorandum of Decision and Order denying LeMense's motion to suppress:

Alaska State Trooper Alan Storey was at the Anchorage International Airport terminal on August 25, 1986, observing passengers as they deplaned Alaska Airlines Flight 85 arriving from Los Angeles and Seattle. After all of the passengers and a portion of the flight crew deplaned, and after most of the people had left the gate area, Trooper Storey noticed an adult male around forty years of age, later identified as LeMense, walk down the jet-way from the aircraft towards the terminal. LeMense walked very slowly and was carrying a briefcase. He did not have a jacket or coat with him and his shirttail, designed to be tucked in, was hanging out. Trooper Storey noted that it was highly unusual for somebody to remain inside of the aircraft and come out so long after the aircraft had deplaned. As LeMense entered the terminal, a tour group hostess approached him and asked if he was the last person on the aircraft. LeMense displayed a very surprised look on his face, looked around the immediate area quickly, and then advised the hostess that he was the last passenger.

Trooper Storey next observed LeMense slowly walk through the seating area surrounding gate B-3, cross the concourse, and stop at a divider adjacent to gates B-2 and B-4. LeMense then placed his briefcase on top of the standing divider and removed from his pocket what appeared to be a napkin. He slowly unfolded the napkin looking around as he was doing so and gestured as though he was blowing his nose. Trooper Storey noted that, while LeMense looked around, there were no sounds typically associated with blowing one's nose, and he was not making any wiping motions with the napkin. He was simply holding the napkin in front of his face and looking up and down the concourse. After throwing the napkin away in a trash receptacle and picking up the briefcase from the divider, LeMense began walking in a mechanical fashion down the concourse.

LeMense proceeded very slowly to the baggage claim area, entered the area at the second entrance, went up to the conveyor belt, and stood with his back to the belt facing the crowd. He picked up a medium size, light brown suitcase with a brown strap around the suitcase, set it on the metal rim of the conveyor belt, and looked over the bag, appearing to confirm that it was, in fact, his suitcase. LeMense then

left the terminal through the nearest exit and hailed a cab.

As a cab stopped and LeMense began to walk toward it, Trooper Storey walked up to him with his badge and identification card in hand, and told LeMense that he was not under arrest, that he could leave if he wanted to, but that the officer wanted to ask a couple of questions. LeMense indicated that Trooper Storey could ask him some questions and asked the trooper what was going on.

Trooper Storey advised LeMense that he was conducting an investigation and he wondered if he could see some form of identification from LeMense. LeMense set down his suitcase, removed his wallet, and produced an Alaska driver's license in the name of Jerome LeMense. Trooper Storey confirmed that the picture ID matched LeMense and noted that the license had an Anchorage address. He also noted that LeMense had begun to shake excessively, that he spoke with a slight stutter, and that his hands were trembling.

Trooper Storey asked LeMense if he had just come in on a flight. LeMense replied yes, stating that he had just come in from Los Angeles and that he had been gone a couple of days. Trooper Storey asked LeMense if he had his airline ticket. LeMense immediately responded that he did not, and that he had thrown it away. Thanking LeMense, Trooper Storey handed him back his driver's license, explained to him that he was conducting a drug investigation, and asked LeMense if he happened to bring any drugs back with him. LeMense indicated no, he had not.

Trooper Storey then asked LeMense if it would be acceptable for Trooper Storey to take a quick look in his suitcase to see if LeMense did have any drugs. LeMense patted his shirt pockets, front pants pockets, and rear pants pockets with both hands and told the trooper that he did not have a key for the suitcase. Trooper Storey inquired, "You don't have the key?" LeMense again patted his pockets and stated that he did not. Trooper Storey asked LeMense if he was sure the bag was locked and LeMense replied yes, and leaned the

suitcase forward, moved the handle, and pointed out a lock that was attached to the brown strap wrapped around the middle of the bag. At that point, LeMense stated that the suitcase was not his, and that he must have gotten someone else's suitcase. LeMense pointed to a tag attached to the side of the suitcase that had the name of Jeffrey Jones on it. LeMense again stated that he must have gotten the wrong bag, and that there must be another bag on the flight which looked the same.

Trooper Storey then invited LeMense to return inside the airport so that LeMense could locate his bag and so that the trooper could attempt to find the rightful owner of the suitcase that LeMense had taken. Trooper Storey picked up the suitcase, went back inside, and LeMense followed along behind him. Once inside, Trooper Storey introduced LeMense to a co-worker, Sergeant Harvey, and then told LeMense that he was free to look around the baggage claim area to see if he could find his luggage. Trooper Storey informed LeMense that he would check with the airline personnel to see if Mr. Jones had asked about his luggage or if Trooper Storey could locate Mr. Jones.

Upon Trooper Storey's request, Alaska Airline agents checked the manifest for flight 85 which revealed that no person by the name of Jeff Jones or Jerome LeMense had traveled aboard that flight. The agents further indicated that no person named Jones had inquired about his luggage.

Trooper Storey then looked about the baggage claim area, but did not observe any other suitcases similar to the suitcase which LeMense had claimed. When LeMense subsequently exited the men's room in the baggage claim area, Trooper Storey again asked him if he could see his identification. Trooper Storey thought it was possible that he had read the name wrong and that that was the reason he was unable to locate LeMense's name on the flight manifest. As LeMense retrieved his identification, Trooper Storey again asked him if the suitcase was his. LeMense replied, "Yes, it must be, since it had a Sea Air ticket at-

tached to the side of it." Trooper Storey confirmed the suspect's name as Jerome G. LeMense from his identification and returned the driver's license to LeMense.

Trooper Storey then asked LeMense if he would be willing to check his briefcase to see if it might contain his ticket. LeMense opened the briefcase, displayed a ticket to Trooper Storey, and advised him that it was the ticket he had used when he left Anchorage. When LeMense handed the ticket to Trooper Storey, he stated that he had not used his real name while traveling. LeMense stated that his wife was in Los Angeles, and they were not getting along well. Trooper Storey observed that the ticket was issued to Jerry Johnson for travel one way on August 24, 1986, from Anchorage to Los Angeles. LeMense later stated that he used the name of Chris Walls on the return portion of his trip.

Trooper Storey inquired again if LeMense might possibly have the key to the suitcase. LeMense responded that the suitcase was indeed his, but he had no key, as he had not placed the strap and lock on the suitcase, did not know how it got there, and, furthermore, could not vouch for the suitcase's contents. LeMense still appeared to be under stress and he never explained why the name "Jones" was on his suitcase.

Trooper Storey then informed LeMense, "What I'd like to do is take this bag up and have our dog take a sniff of it. You want to come along and watch us do that?" LeMense responded, "If there's something there, I don't know what's in there." Trooper Storey asked LeMense "Well, you mind coming along to the office and see if we can sort this out? Is that all right?" LeMense responded, "That's fine. No, I, I, I have nothing to hide." LeMense then accompanied Trooper Storey to the Airport Detail Office.

Immediately upon arrival at the office, Trooper Storey placed the suitcase in the hallway of concourse C between a large planter and an Anchorage Daily News vending machine. Trooper Storey then brought scent detection canine, Irma, into the concourse and put her into a "down" position.

Trooper Storey, following established search procedure, "prescented" the area, i.e., he personally touched numerous items to ensure that the dog would not be attached to the suitcase merely because he had handled it. Trooper Storey then commanded Irma to search the area for the presence of controlled substances. He noted that as Irma worked her way along the wall, around the planter, past the suitcase, and around the Anchorage Daily News vending machine, Irma gave an "area alert" in the vicinity of the suitcase. Trooper Storey then placed the suitcase flat on the floor and redirected Irma to search the area in the immediate vicinity of the suitcase. Irma sniffed around the planter, and upon inhaling near the suitcase, alerted to that item specifically.

LeMense, observing from a short distance away, expressed his concern that the movement of the suitcase had caused the dog to alert to it. Trooper Storey noted LeMense's concern and advised him that he would leave the suitcase in its present position and have Irma search the area again. Irma then alerted to the suitcase a second time.

Trooper Storey then asked LeMense to accompany him inside the Airport Detail Office. LeMense was provided a seat and Trooper Storey advised him, "You're not under arrest, okay, and I want you to understand that. Do you understand you're not under arrest now?" LeMense indicated he understood. Trooper Storey told LeMense that he wanted to ask him some questions and LeMense said, "Okay." Trooper Storey stated, however, that before he asked him any questions, he wanted to make sure LeMense understood all of his rights. At that point, Trooper Storey gave LeMense his *Miranda* rights. LeMense then stated he would be willing to answer some questions. LeMense asked if the conversation was being taped. Trooper Storey told him that it was.

During the interview, LeMense indicated that the suitcase was his. He denied, however, having any knowledge of the strap or

lock attached to the suitcase. He further indicated that the reason he had used assumed names while traveling was that he did not wish his wife to know that he was going to Los Angeles. Subsequently, however, he indicated that his reason to travel was to see his wife from whom he was separated, and that she was residing in Los Angeles. LeMense also indicated that he had used an assumed name on the return trip because he had used one while departing and felt it would be appropriate to use another one while returning.

Trooper Storey informed LeMense that he was going to seek a search warrant for the suitcase, and that they would contact LeMense at his residence after the suitcase had been searched. Trooper Storey further advised him that in the event the search warrant was not granted or nothing was discovered as a result of the search, he would contact LeMense immediately to return the suitcase to him. Trooper Storey asked LeMense if he had any questions. LeMense replied that he had none. Trooper Storey told LeMense that they would get back to him as soon as possible regarding the suitcase.

After LeMense departed the Airport Detail Office, Trooper Storey completed notes in preparation for the search warrant and testified before Magistrate J. Warner. Magistrate Warner approved the search warrant and the warrant was executed.

Upon opening the suitcase, two manila envelopes were found which in total contained about five pounds of white crystalline powder in ziplock plastic bags. Powder from one of the manila envelopes was field tested, yielding a positive reaction for the presence of cocaine.[1]

## INVESTIGATIVE STOP

This case, like the recent case of *State v. Garcia*, 752 P.2d 478 (Alaska App.1988), turns on the law concerning investigative stops. In *Garcia*, we summarized the law as follows:

> Police are authorized to perform an investigative stop where they have reasonable suspicion that imminent public danger exists or that serious harm to persons or property has recently occurred. *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976). When the police reasonably suspect that someone is a drug courier presently engaged in transporting drugs, imminent public danger exists for purposes of the *Coleman* standard. *Pooley v. State*, 705 P.2d 1293, 1307 (Alaska App.1985).

Not every contact between a police officer and a private citizen rises to the level of an investigative stop. Police may direct questions to private citizens if their behavior was not " 'conduct which a reasonable man would view as threatening or offensive even if coming from another private citizen.' " *Waring v. State*, 670 P.2d 357, 364 (Alaska 1983) (quoting 3 W. LaFave, *Search and Seizure* § 9.2 at 53–54 (1978)). A mere request for identification does not automatically turn the encounter into a *Coleman* stop as long as the identification was not retained for an unnecessarily long time. *Pooley*, 705 P.2d at 1306. The officer may continue to ask questions if the officer's suspicions are not satisfied by the answers the officer receives. *Id.*

A person is seized only if a reasonable person in his or her position would not feel free to leave. *Waring*, 670 P.2d at 364; *Pooley*, 705 P.2d at 1305. At the point where the person is seized, the seizure must be justified by at least reasonable suspicion under the *Coleman* standard. The exposure of luggage to a dog trained to detect drugs is a search. Because the search is minimally intrusive, however, the police may conduct this type of search when they have a reasonable suspicion that drugs are present in the containers and that the drugs are being illegally imported into the state or are being illegally possessed for distribution. *Pooley*, 705 P.2d at 1311. Whether reasonable suspicion exists is a mixed question of fact and law. The trial court's findings of historical fact should be overturned only if clearly

---

1. End of factual discussion taken from Judge Carlson's memorandum decision.

erroneous. *Pooley,* 705 P.2d at 1305. Whether the facts of the case justify reasonable suspicion is subject to *de novo* review. *United States v. Erwin,* 803 F.2d 1505, 1509–10 (9th Cir.1986). *Id.* at 480.

■ Trooper Storey was entitled to approach LeMense and inquire whether LeMense would answer questions and produce identification. A harder question is whether Trooper Storey could ask LeMense whether he could look inside his suitcase to see if the suitcase contained drugs without converting this encounter into an investigative stop. From Judge Carlson's factual findings, it appears that Trooper Storey conducted himself in a polite, nonauthoritative manner. He had earlier told LeMense that he was not under arrest and could leave if he wanted. We do not believe that the trial judge was required to conclude, as a matter of law, that Trooper Storey could not ask LeMense if he could look through his suitcase without turning this encounter into an investigative stop. Certainly LeMense could have consented to a search under these circumstances if the trial court found that the consent had been voluntarily given. *Brown v. State,* 684 P.2d 874, 880 (Alaska App.1984). It seems to us that a reasonable person in LeMense's position could well have concluded that he or she was free to terminate the encounter and walk away.

■ Once we conclude that Trooper Storey could ask to look in LeMense's luggage, we may consider the statements that LeMense made to Trooper Storey in response to that request. LeMense denied that he had a key to the suitcase and then denied that the suitcase was his. He also pointed to the tag with the name Jeffrey Jones on it. In response to this, Trooper Storey "invited" LeMense to return to the airport to see if they could find that rightful owner. Trooper Storey carried LeMense's suitcase back to the terminal. At this point, Trooper Storey had sufficient reasonable suspicion to allow him to detain LeMense and his bag, at least for this limited purpose of checking out his story concerning the suitcase. *See United*

*States v. Sokolow,* 831 F.2d 1413, 1423 (9th Cir.1987), *petition for cert. filed,* 56 U.S. L.W. 3542 (U.S. Feb. 2, 1988) (No. 87–1295) (evasive actions and traveling under an alias are common indicators of ongoing criminal activity which may be considered by police in forming reasonable suspicion). When that story did not turn out to be true, the trooper had sufficient reasonable suspicion to subject the suitcase to a limited search involving a dog trained in detecting drugs. Once the dog alerted to the suitcase, Trooper Storey had sufficient information to seize the suitcase to attempt to obtain a warrant. Clearly, there was probable cause to issue a search warrant at this point.

## SCOPE AND LENGTH OF DETENTION

■ In a related issue, LeMense argues that the police did not have sufficient grounds to take his luggage to the terminal and subject it to the search by the drug-detection dog. He argues that the detention took "almost thirty minutes" and involved transporting him and his luggage to a police office within the airport. He contends that this intrusion was significant enough that it could only be supported by probable cause.

In *United States v. Place,* 462 U.S. 696, 709–10, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983), the court held that although a brief stop of luggage might be permissible based upon reasonable suspicion, holding the defendant for ninety minutes to subject his luggage to examination by a drug-detection dog constituted an unreasonable search and seizure under the fourth amendment to the United States Constitution. In *Pooley,* we held that a person's luggage could be subjected to examination by a drug-detection dog based upon reasonable suspicion. 705 P.2d at 1311. Any investigative stop, however, must be reasonable in terms of scope and duration. *Id.* What is reasonable turns on the facts of the individual case. In the instant case, once LeMense denied that the luggage was his and pointed out the other name on the luggage, the police had reasonable grounds, when coupled with their other ob-

servations, to check further. As they checked further, they developed reasonable grounds to subject the luggage to examination by the drug-detection dog. At most, the entire procedure took less than thirty minutes. We conclude that the detention of LeMense and his luggage was not unduly intrusive.

## MIRANDA WARNINGS

LeMense contends that Judge Carlson erred in failing to suppress statements that LeMense made because he was not given *Miranda* warnings until the dog alerted to his suitcase. A police officer must give a person *Miranda* warnings whenever the officer questions a person who is in custody. In *Hunter v. State*, 590 P.2d 888 (Alaska 1979), the supreme court adopted an objective reasonable person test for determining when a person is in custody. A person is in custody when the person is significantly deprived of his or her freedom. *Id.* at 895. The court discussed three groups of facts for determining when a person was in custody:

The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Id.* at 895; *see also Berkemer v. McCarty*, 468 U.S. 420, 435–42, 104 S.Ct. 3138, 3147–51, 82 L.Ed.2d 317 (1984) (ordinary traffic stops are not "custody" for purpose of a *Miranda* warning).

The instant case appears to be similar to *Hintz v. State*, 627 P.2d 207 (Alaska 1981). In *Hintz*, the police had received a report that a woman had been forced into her car by someone. The woman had screamed at the time she was forced into the car. A state trooper was told he should stop the woman's car because there were suspicious circumstances. The trooper stopped the car and held Hintz for the city police. A city police officer, based on similar information, questioned Hintz without giving him *Miranda* warnings. Hintz made statements which were used against him at trial. At this point, the city police officer received word that the woman who owned the car had reported that she was raped. Hintz was arrested and given *Miranda* warnings. The supreme court held that Hintz was not in custody until his arrest, so that no *Miranda* warnings were necessary before that time. *Id.* at 209. The court indicated that even though Hintz had been subject to an investigative stop, he was not in custody for purposes of *Miranda*. *See also Lowry v. State*, 707 P.2d 280, 283–85 (Alaska App.1985).

Similarly, in this case, even though the police took control of LeMense's luggage when he reported that the luggage was not his, and the police continued to investigate the situation, the limitations on LeMense were temporary and limited to a brief investigation of the suitcase. LeMense was given considerable freedom to move on his own within the airport during the investigative detention and was released after the investigation was completed. We conclude that Judge Carlson did not err in finding that LeMense was not in custody for purposes of *Miranda* warnings until the police gave those warnings after the dog alerted to the suitcase.

## MISREPRESENTATION AT SEARCH WARRANT HEARING

LeMense next argues that Judge Carlson erred in not suppressing the result of the search which the police conducted pursuant to the search warrant because Trooper Sto-

rey did not more fully describe the actions of the drug-detection dog at the time that the dog alerted to LeMense's luggage. Essentially, Trooper Storey told the magistrate only that the dog had alerted to the suitcase. LeMense argues that it was a material misrepresentation not to inform the magistrate that the dog gave only an "area alert" when she went by the suitcase the first time, and that Trooper Storey had placed the suitcase on its side before the dog alerted to the suitcase.

■ *State v. Malkin*, 722 P.2d 943 (Alaska 1986), is the leading case in this area. When the defendant shows that the state has made a material misrepresentation in obtaining a warrant, the state has only to show that misrepresentation was not made intentionally or recklessly. *Id.* at 946. Judge Carlson found that although the police should have more fully informed the magistrate as to the facts surrounding the dog's alert to LeMense's luggage, the failure to do so did not warrant suppression under *Malkin.* We conclude that this ruling was sound. First, although we agree that the police should have presented the information more fully to the magistrate, the additional information would not have been material, *i.e.*, the additional information would not have changed the magistrate's decision to issue the warrant. In addition, the record supports Judge Carlson's apparent conclusion that the state established that the failure to present the additional information was not reckless.

The conviction is AFFIRMED.[2]

---

**2.** LeMense also argues that Judge Carlson erred in not dismissing the indictment against him. Although there is a substantial question whether LeMense preserved this issue with his *Cooksey* plea, we have concluded that this matter will be expedited by our treating these issues. We conclude that the definition of "knowingly" which was presented to the jury was not improper. We also conclude that the court did not err in refusing to dismiss the indictment because Trooper Storey's estimate of the street value of the drug lacked sufficient foundation.