**Gregory D. WRIGHT, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2863.**

Court of Appeals of Alaska.

July 27, 1990.

---

Linda R. MacLean, Anchorage, for appellant.

Valerie A. VanBrocklin, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Alaska State Troopers discovered marijuana in Gregory D. Wright's suitcase after Wright arrived at Anchorage International Airport from Honolulu. Wright entered a plea of no contest to one count of misconduct involving a controlled substance in the fourth degree, preserving his right to appeal the trial court's denial of his suppression motion. *See Oveson v. Anchorage*, 574 P.2d 801, 803 n. 4 (Alaska 1978); *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974). We affirm.

On December 22, 1987, Trooper Allen Storey received information that a Hawaiian Airlines ticket agent suspected that Wright fit the "drug profile" and that Wright would be arriving in Anchorage from Honolulu that night. The ticket agent provided a physical description of Wright, Wright's local phone number, and indicated that Wright had departed Anchorage for Honolulu on December 18. The ticket agent indicated that Wright traveled to Hawaii four or five times within the past five or six weeks, that Wright's trips were short, and that Wright purchased his ticket in cash. The ticket agent said that Wright always traveled with the same suitcase which felt light for a large bag and contained a five to eight pound soft item which shifted in the suitcase. Finally, the ticket

agent claimed to have experience with "drug profiles" at other airports. Storey was also provided with a computer printout of Wright's criminal history. The printout provided a physical description consistent with that provided by the ticket agent. It also indicated that Wright had been previously convicted for DWI, disorderly conduct, assault on a police officer, and driving without a license.

Wright arrived as predicted by the ticket agent, and Storey first observed Wright waiting in the baggage claim area. Before the passengers' luggage appeared on the carrousel, Wright walked outside to where his girlfriend and son were waiting to pick him up. Storey believed that Wright left because he realized that Storey was watching him. Storey followed Wright to the waiting vehicle and asked whether he could talk with him. Wright said, "Sure." The conversation continued:

> STOREY: You're not under arrest or in any trouble, you can actually leave without saying anything. But, can I ask you a couple of questions?
>
> WRIGHT: About what?
>
> STOREY: Well, you have any I.D. I could take a look at real quick? Is that possible?
>
> WRIGHT: Not on me right now.
>
> STOREY: You don't have any driver's license? How about your airline ticket? You got that with you?
>
> WRIGHT: Yeah, just a minute.

Wright showed his airline ticket to Storey, which indicated that Wright had been traveling under his own name. However, Wright stated that he "lost" his driver's license. Wright also consented to Storey's request to search Wright's hand luggage.

Storey next inquired about Wright's checked luggage, and Wright seemed to indicate his intention to pick up his luggage when it arrived on the carrousel. Storey asked Wright whether it contained marijuana and Wright responded, "No way." Storey questioned Wright about the frequency and the length of Wright's trips to Hawaii. Wright responded that he had been gone for "about a week" and that he did not go to Hawaii "very often—a couple of times a

year." In response to another question, Wright stated that he was self-employed as a drywall contractor but that he was not currently working. Storey then returned Wright's ticket, and the conversation again turned to the issue of Wright's checked baggage. This time, Wright said that he was planning on coming back for his bags later.

Storey began to challenge Wright concerning Wright's trips to Hawaii and indicated his suspicions that Wright was importing marijuana. Storey also asked for and received Wright's address and telephone number. The telephone number differed from that provided by the ticket agent by only a single digit, and the address was consistent with that which appeared on the printout of Wright's criminal history.

Storey then asked for permission to look in Wright's checked suitcase when it arrived on the carrousel. Wright responded that that would be difficult because he had lost the key. Storey said that he had a device which could open the lock, and Wright responded, "I'm sure you do, but I'd rather just take it and do it myself." Wright then described his luggage and showed Storey the claim check.

At this point, Storey told Wright that he was going to have a dog check Wright's luggage and that Wright was free to either stay or leave. Wright elected to remain at the airport, and troopers subjected his suitcase to a canine sniff after it arrived on the carrousel. According to Storey, Irma, a scent detection canine, responded positively to Wright's suitcase. Wright left the airport, but Storey retained his suitcase. Storey received a search warrant to open the suitcase the next day; it contained more than ten pounds of marijuana.

■ Wright first contends that Storey's initial contact with him constituted an arrest which was not supported by probable cause. We do not agree that this encounter, where Storey approached Wright in a public place and asked him questions, constituted a seizure of constitutional dimension. *Waring v. State*, 670 P.2d 357, 363

(Alaska 1983). We rejected a nearly identical claim, also involving Trooper Storey, in *LeMense v. State*, 754 P.2d 268 (Alaska App.1988). We concluded that Storey was entitled to approach LeMense, inquire whether LeMense would answer a few questions, request whether he could look in LeMense's suitcase, and inquire whether LeMense was carrying any drugs:

> [I]t appears that Trooper Storey conducted himself in a polite, nonauthoritative manner. He had earlier told LeMense that he was not under arrest and he could leave if he wanted. We do not believe that the trial judge was required to conclude, as a matter of law, that Trooper Storey could not ask LeMense if he could look through his suitcase without turning this encounter into an investigative stop. Certainly LeMense could have consented to a search under these circumstances if the trial court found that the consent had been voluntarily given. *Brown v. State*, 684 P.2d 874, 880 (Alaska App.1984). It seems to us that a reasonable person in LeMense's position could well have concluded that he or she was free to terminate the encounter and walk away.

*LeMense*, 754 P.2d at 273. Storey's manner was similar in this case. The trooper was dressed in casual clothes, immediately informed Wright that Wright was not under arrest and free to go, and did not use any physical force.[1]

■ Wright also points to Storey's momentary control of Wright's airline ticket and hand luggage as evidence of a seizure. However, Storey promptly returned these items to Wright. It is settled that a law enforcement officer may request and briefly inspect a person's identification without turning the encounter into a constitutional seizure. *Waring*, 670 P.2d at 364; *Brown*, 684 P.2d at 877. Similarly, as indicated in *LeMense*, an individual can consent to an officer's request to search luggage without turning the encounter into an investigative stop. 754 P.2d at 273.[2]

■ Wright next argues that Storey did not possess reasonable suspicion which was required to detain his luggage for purposes of the canine sniff. *See United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642–43, 77 L.Ed.2d 110 (1983); *Pooley v. State*, 705 P.2d 1293, 1310–11 (Alaska App. 1985). We do not agree, finding that Storey possessed an adequate fund at particularized and specific information to justify the search.[3] In evaluating the strength of Storey's suspicion, we note that the actual intrusiveness of the canine sniff was minimal and that we have previously held the transport of illegal drugs over long distances for commercial purposes to be an "imminent public danger" as required to justify an investigative stop by *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976). *See Peschel v. State*, 770 P.2d 1144 (Alaska App.1989); *LeMense*, 754 P.2d at 272; *State v. Garcia*, 752 P.2d 478, 480 (Alaska App.1988); *Pooley*, 705 P.2d at 1307; *see also State v. G.B.*, 769 P.2d 452, 454–56 (Alaska App.1989).

We recognize that many of the facts that Storey was able to develop before deciding to briefly detain Wright's baggage for a canine sniff are readily capable of innocent explanation. Indeed, to the casual observer, Wright might have appeared to be a typical traveler returning from a Hawaiian vacation. However, when taken together, we believe the facts sufficient to have justified Storey's actions.

First, Storey possessed information from a citizen informant upon which he could

---

1. In the trial court, Wright claimed that Storey had initially grabbed Wright by the shoulder and turned him around. The superior court's rejection of this allegation is not clearly erroneous. Wright also contends that Storey did not approach him until Wright's exit from the airport was effectively blocked by several other cars. The factual basis of this claim is weak, however, and there is no indication that any vehicles in the area were under the control of the state troopers.

2. Wright never contended that the search of his hand luggage was anything but consensual.

3. Since we uphold the canine sniff on these grounds, we do not address the superior court's alternative holding that Wright consented to the canine sniff.

reasonably rely that Wright made several brief journeys to Hawaii over the past few weeks. *See Effenbeck v. State,* 700 P.2d 811, 813–14 (Alaska App.1985). Law enforcement officers believe Hawaii to be a major source of marijuana. Second, Storey testified that Wright appeared to leave the baggage claim area before his suitcase arrived because Wright became aware that Storey was observing him.

When Storey approached Wright, Wright was unable to produce a driver's license, saying that he "lost" it; however, the record suggests that Storey understood this to mean that Wright's license had been suspended which, in fact, was the case. Additionally, Storey had ample evidence that Wright had correctly identified himself. *Cf. Gibson v. State,* 708 P.2d 708, 710 (Alaska App.1985) (air bill on package provided false return address and telephone numbers); *Pooley,* 705 P.2d at 1296–97 (suspect provided airline with false address and telephone number). Nevertheless, Storey's suspicions were legitimately heightened during this encounter. Wright slightly overrepresented the length of his trip to Hawaii and denied having made more than two trips in the last three months. Wright indicated that he was currently unemployed, allowing Storey to legitimately question how Wright could have afforded numerous trips to Hawaii. Most significantly, Wright initially seemed to indicate that he was going to pick up his suitcase as soon as it arrived in the baggage claim area; however, after additional conversation with the trooper, Wright changed his story and said that he was planning on leaving the airport and returning for his suitcase later.

Wright also stated that he lost the key to his suitcase. This refusal could properly reinforce Storey's prior suspicions. 3 W. LaFave, *Search and Seizure* § 8.1, at 148 (2d ed. 1987). Furthermore, Storey indicated that in his experience drug couriers often claim to have lost the keys to their suitcases. *See LeMense,* 754 P.2d at 270–71 (suspect made several evasive comments

concerning his suitcase, including that he did not have the key).

Considering the totality of the circumstances, we conclude that Storey possessed the requisite reasonable suspicion necessary to subject Wright's suitcase to a minimally intrusive canine sniff.

■ Wright next argues that Storey made two material misrepresentations in seeking a search warrant to open Wright's suitcase. *See State v. Malkin,* 722 P.2d 943 (Alaska 1986). First, Wright complains that Storey did not tell the magistrate that Wright disputed that the canine, Irma, had actually responded to his suitcase. We reject this argument. As Irma's handler, Storey observed the canine respond literally hundreds of times, and Wright had an obvious motive to deny that Irma responded to his suitcase. We do not believe that this additional information would have changed the magistrate's decision to issue the warrant, and Storey's failure to include this detail does not appear to have been an attempt to intentionally or recklessly misrepresent the facts. *See LeMense,* 754 P.2d at 274–75.

Second, Wright contends that Storey inaccurately represented to the magistrate that Wright had "abandoned" his suitcase at the airport. However, the record indicates that Wright told Storey that he intended to leave his suitcase at the airport and come back for it later, and this was the extent of Storey's representation to the magistrate. Moreover, even if Wright intended to claim his baggage immediately, Storey would have been justified in subjecting it to a brief, minimally intrusive canine search since, as we have stated, he possessed reasonable suspicion. Accordingly, the magistrate properly issued the search warrant.

The conviction is AFFIRMED.[4]

---

**4.** Wright also challenges the superior court's
procedures in ruling on his suppression motion.

However, our review of the record demonstrates that the superior court judge adequately reviewed the disputed issues of material fact in this case and accordingly did not abuse his broad discretion. *Davis v. State,* 766 P.2d 41, 43 (Alaska App.1988).

