**Jeremiah Jay HAAG, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–8687.**

Court of Appeals of Alaska.

July 22, 2005.

---

**3.**  *See Gibbs,* 105 P.3d at 148.

776

David D. Reineke, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Jeremiah Jay Haag was convicted of first-degree robbery, evidence tampering, and fourth-degree controlled substance misconduct. Haag appeals his robbery conviction, and he also appeals the sentences he received for all three crimes. Haag's appeal presents three groups of issues.

First, Haag attacks his indictment on two grounds. He argues that the prosecutor failed to present exculpatory evidence to the grand jury. For the reasons explained here, we conclude that the omitted evidence was not "exculpatory" as that term has been defined in our case law governing a prosecutor's duty to present evidence to the grand jury. Haag also attacks his indictment because, during the grand jury proceeding, a police witness referred to the fact that Haag invoked his right to silence when he was

questioned about the robbery. We conclude that this error was harmless: the prosecutor immediately cautioned the grand jury to disregard this reference and, given the other evidence presented to the grand jury, it is unlikely that the grand jury's decision was influenced by this reference.

Second, Haag claims that much of the evidence against him should have been suppressed. He argues that the officers who responded to the report of the robbery subjected him to an illegal stop, and he further argues that, following this illegal stop, the officers displayed him to the victim of the robbery and another witness in an unconstitutionally suggestive manner. For the reasons explained here, we conclude that the stop was justified and that the ensuing encounter between Haag and the witnesses was not improperly suggestive.

Finally, Haag challenges his sentence. He challenges his composite sentence as too severe, and he also levels a constitutional challenge to his robbery sentence. Haag's sentencing for the robbery was governed by Alaska's presumptive sentencing laws as they existed in the pre–2005 versions of AS 12.55.125–175. Haag contends that these presumptive sentencing laws denied him his right to jury trial under the Sixth Amendment to the United States Constitution as interpreted in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

We do not reach the issue of whether Haag's composite sentence is unlawfully severe because we conclude that Haag's rights under *Blakely* were abridged when he was sentenced for the robbery conviction. Accordingly, we vacate Haag's robbery sentence and we remand his case to the superior court for re-sentencing. After the re-sentencing, Haag may renew his argument that his composite sentence is unlawfully severe.

### Underlying facts

The victim of the robbery, Bert Holland, was living in his son's apartment in Anchorage. Holland was partially disabled, having suffered a crushed hip in 1997. Haag, who was known by the name "J.J.", was Holland's neighbor.

Shortly after midnight on October 2, 2001, Holland heard a knock on the back door of the apartment. Holland was expecting Haag to visit, and the knock sounded like Haag's knock, so Holland opened the door. When he did so, two masked men entered the apartment. These men were dressed in dark clothing, and both were armed with handguns.

The men demanded Holland's prescription medicine. (Holland took assorted pain medications for his crushed hip. Haag knew this, and he also knew that Holland had just had his prescriptions refilled the previous afternoon.)

The taller of the men took two bottles of prescription pain-killers from Holland, and then he left the apartment. The shorter man remained for several minutes longer. This shorter man located a bottle of the pain-killer Diazepam, which he took, and then he grabbed two cordless telephones from the wall. Finally, the shorter man left the apartment.

Unbeknownst to Holland, there was another witness to the robbery. Holly Holder, Holland's daughter-in-law, had heard the knock on the apartment door and the ensuing commotion when the two robbers entered. Holder, who was upstairs at the time, crept down the staircase, peeked around a corner, and witnessed the robbery. She then went back upstairs and crawled through a window to reach a neighbor's house and summon help.

The neighbor called 911. Relaying information provided by Holder, the neighbor told the 911 operator that there were "two [armed] black males ... in [Holland's and Holder's] apartment". Holder then got on the phone and repeated the information that "two black males", "dressed all in black", were in the apartment. The police dispatcher soon alerted officers in the field to be on the lookout for two black males, dressed in black, one of whom was tall and skinny.

Officer Glenn Daily responded within one minute of the robbery dispatch. He parked his vehicle a few hundred yards to the east of the apartment complex, and he soon saw a

man running away from the apartment complex toward a gap in an adjacent fence. This man was dressed in predominantly black clothing, and he wore dark gloves. Officer Daily yelled for this man to stop, but the man continued running. With gun drawn, Daily pursued and intercepted the running man—who turned out to be Haag.

Daily handcuffed Haag and patted him down for weapons. Haag had no weapons. Daily then took Haag back to the apartment complex for a show-up—that is, to display him to Holland and Holder, to see if they could identify him.

Bert Holland could not identify Haag as one of the robbers. However, Holly Holder immediately identified Haag as one of the robbers, based on his dark attire and his build. (Haag was the shorter of the two robbers.) Then Holder looked the man in the face and realized that he was their neighbor, "J.J." Haag.

Based on Holder's identification, Officer Daily placed Haag under arrest and transported him to the police station for booking. After delivering Haag to the police station, Daily inspected the back of his patrol car where Haag had been riding. Behind the seat cushion, Daily found a prescription bottle for Diazepam; the prescription was issued to Bert Holland.

Meanwhile, officers were combing the area where Haag had been running before he was apprehended. They found a handgun near the opening in the fence where Daily had seen Haag stop briefly. And along the path between the fence opening and the apartment complex, the officers found the two cordless phone receivers, as well as a sleeve of black sweatshirt material (which they presumed to have been used as a mask).

Haag's accomplice was never apprehended.

*The grand jury issues*

■ Haag is white. When Haag's case was presented to the grand jury, the prosecutor did not present any testimony concerning the fact that Holly Holder initially stated

(to her neighbor, and then to the 911 operator) that the two robbers were black. Haag contends that, because of this omission, the prosecutor violated the *Frink* rule—that is, violated the duty imposed by Criminal Rule 6(q) to present exculpatory evidence to the grand jury. *See Frink v. State*, 597 P.2d 154, 165–66 (Alaska 1979).

But, for purposes of the *Frink* rule, the term "exculpatory" has been defined narrowly; it refers only to evidence that "tends, in and of itself, to negate the defendant's guilt".[1] The fact that Holder initially stated that both robbers were black is certainly something that a defense attorney might use to attack Holder's later identification of Haag as one of the robbers. But this is not information that negates Haag's guilt in and of itself. For this reason, we reject Haag's contention that the prosecutor violated Criminal Rule 6(q) by failing to present this evidence.

■ Haag next contends that the grand jury proceedings were fatally flawed because a police witness adverted to the fact that Haag, while being interviewed about the robbery, eventually asserted his right to silence and declined to say anything more.

Anchorage Police Detective Nancy Potter told the grand jurors that she interviewed Haag after he was brought to the police station. In response to the prosecutor's question, "Did Mr. Haag ... [give] a statement in this case?", Potter told the grand jurors that Haag initially claimed that he spent the evening watching Monday night football, and then he went out jogging—only to be seized by the police. Haag asserted that several people could confirm that he normally went jogging at that time of night. However, Potter told the grand jurors that when she began to press Haag to explain certain inconsistencies in his account of the evening, "[Haag] decided [that] he didn't want to talk to me anymore".

As soon as Detective Potter uttered these words, the prosecutor interjected:

---

1. *Cathey v. State,* 60 P.3d 192, 195 (Alaska App. 2002), quoting *State v. McDonald,* 872 P.2d 627, 639 (Alaska App.1994).

*Prosecutor:* All right. And you know what? I'm going to ask the [grand] jury to please disregard any inference that they might take from ... what the police officer just [told] us. You should not draw any kind of inference [concerning] Mr. Haag's ... guilt or innocence based upon the fact that it appears that ... he did not want to answer any more questions at that point. And so you are instructed that that should not have any kind of effect on your deliberations in this case, and it needs to be completely disregarded by you.

On appeal, Haag argues that Detective Potter made an improper adverse comment on Haag's invocation of his right to silence. But, as just explained, the prosecutor immediately recognized the problem and gave a curative instruction to the grand jury. Moreover, the other evidence presented to the grand jury amply justified Haag's indictment. For these reasons, we conclude that Detective Potter's comment was harmless.[2]

### The suppression issues

As explained above, Officer Daily subdued Haag at gunpoint, handcuffed him, and then brought him back to the apartment complex for the show-up. Haag asserts that this amounted to an arrest without probable cause. Haag argues in the alternative that even if Daily's actions are deemed an investigative stop rather than an arrest, this stop was improper because the facts known to Daily did not support an articulable suspicion that Haag was involved in the recent robbery.

We turn first to the contention that Daily's encounter with Haag amounted to an arrest rather than merely an investigative stop. In *Howard v. State,* 664 P.2d 603, 609–610 (Alaska App.1983), and again in *Pooley v. State,* 705 P.2d 1293, 1309 (Alaska App.1985), we identified several factors that courts should use in distinguishing between detentions that will be deemed investigative stops and detentions that will be deemed arrests.

First, a court should examine the purpose for the detention and, specifically, the kind of criminal activity being investigated.

Second, a court should examine whether the detention was for a limited and specific inquiry. That is, a court should ask whether the police were diligently pursuing a means of investigation that was likely to soon resolve whether a crime had occurred, or to soon resolve the issue of whether the suspect had participated in the crime.

Third, a court should examine whether the detention was of brief duration—although, for these purposes, whether a detention will be deemed "brief" must depend, in part, on what the police learn during the encounter. If the results of the encounter dispel the questions in the officer's mind, the detention can go no further—and any continued detention will constitute an improper stop or an illegal arrest. If, on the other hand, the results of the encounter confirm the officer's suspicions or further arouse those suspicions, then the detention may justifiably be prolonged or its scope enlarged.

Fourth, a court should examine whether, during the detention, the police required the suspect to travel with them to another location. If the suspect is involuntarily transported a lengthy distance,[3] or if the suspect is detained at another location for a lengthy period of time,[4] the detention will be deemed an arrest.

And fifth, a court should examine the amount of force used by the police in effectuating the detention. The amount of force used in an investigative stop must be proportional to the risk reasonably foreseen by the officers at the time they make the stop.

Applying these criteria to Haag's case, we conclude that Daily's actions did not amount

**2.** *See Stern v. State,* 827 P.2d 442, 445–46 (Alaska App.1992) (explaining the test for whether an indictment should be invalidated if the grand jury heard inadmissible evidence).

**3.** *See Lowry v. State,* 707 P.2d 280, 283 (Alaska App.1985): "There can be little doubt that the [investigative] stop would have ripened into a full-blown arrest if Lowry had still been in deten-tion when [he was] transported [from Eagle River] to Anchorage for questioning; probable cause ... would then have been required."

**4.** *See Lindsay v. State,* 698 P.2d 659, 662 (Alaska App.1985) (suspect was transported to the police station and interrogated for nearly an hour).

to an arrest; rather, they constituted an investigative stop. It is true that Daily subdued Haag at gunpoint, and then handcuffed him. But Daily was investigating an armed robbery that had been committed only minutes before, and he was dealing with a suspect who ran from him. Under these circumstances, the officer did not exceed the proper bounds of an investigative stop when he used substantial force (a drawn weapon and handcuffs) to detain and restrain Haag. *See*, for example, *Lowry v. State*, 707 P.2d 280, 282–83 (Alaska App.1985) (where the officer's gun was drawn but the suspect was not handcuffed), and *Howard*, 664 P.2d at 611.

It is also true that, after Daily took Haag into custody, Daily transported Haag back to the apartment complex—a distance of several hundred yards—to see if Holland or Holder could identify Haag as one of the robbers. However, our cases indicate that Daily's act of transporting Haag back to the apartment complex did not turn the investigative stop into an arrest. Rather, an encounter can remain an investigative stop (rather than an arrest) even though the police transport the suspect a short distance for a show-up or other identification procedure.[5] *See Le-Mense v. State*, 754 P.2d 268, 273 (Alaska App.1988). *See also Vessell v. State*, 624 P.2d 275, 278–79 (Alaska 1981).

■ For these reasons, we reject Haag's contention that his initial encounter with the police was an arrest. Instead, we conclude that it was an investigative stop. The next question is whether the police had justifiable suspicion for this stop.

Haag argues that the police lost any justification for holding him once they realized that Haag was white, rather than black, and once they realized that, although Haag was wearing predominantly black clothing, his clothing was not entirely black (as Holly Holder had told the 911 operator). Haag argues that the basis for his continued detention was further undercut when the police patted Haag down and found no weapons.

But Officer Daily saw Haag just a few hundreds yards from the scene of an armed robbery that had occurred only minutes before. It was shortly after midnight, and no one else was about. Haag was running away from the crime scene, he was dressed in predominately black clothing, and he failed to stop when directed to do so. It is true that Holder described the robbers as being black men, but she also stated that they were wearing ski masks. Moreover, when Haag was apprehended, he was wearing dark gloves. These circumstances raised the possibility that Holder was mistaken about the robbers' skin color.

Given these facts, we conclude that the police were justified in temporarily detaining Haag so that he could be presented to the witnesses and either identified or excluded as one of the robbers. *See Coleman v. State*, 553 P.2d 40, 42–43, 46 (Alaska 1976), *Maze v. State*, 425 P.2d 235, 238 (Alaska 1967), *and Goss v. State*, 390 P.2d 220, 224 (Alaska 1964) (upholding investigative stops under similar facts).

■ Finally, Haag argues that even if the police were justified in conducting the investigative stop, Holder's ensuing identification of Haag as one of the robbers should be suppressed. Haag contends that the show-up—that is, the displaying of Haag to the two witnesses, Bert Holland and Holly Holder—was improperly suggestive.

Haag points out that he was standing next to a patrol car, in handcuffs, when he was presented to these two witnesses. He also points out that Holland, who was face to face with the robbers for several minutes, could not identify Haag as one of the robbers, while Holder (the witness who identified Haag as one of the robbers) was "peek[ing] around the corner" at the robbers and therefore, assumedly, did not get as good a view of them as Holland. Haag argues that Holder identified him "out of reflex after seeing him [under] incriminating [circumstances]".

These factors may tend to diminish the reliability of Holder's identification of Haag, but they do not mean that the show-up was

---

5. This point is discussed at some length in Wayne R. LaFave, *Search and Seizure: A Treatise on the* *Fourth Amendment* (4th ed.2004), § 9.2(g), Vol. 4, pp. 347–354.

unconstitutionally suggestive. The supreme court addressed the legality of an analogous show-up in *Vessell v. State*, 624 P.2d 275 (Alaska 1981).

The defendant in *Vessell* was stopped on suspicion of having robbed a convenience store. Within minutes, the police transported him back to the store. The store clerk and a customer who had witnessed the robbery were asked to take a look at Vessell while Vessell was sitting handcuffed in the back seat of a patrol car. Both witnesses identified Vessell as the robber—not based on his facial features (the robber had worn a mask), but rather based on his clothing.[6]

On appeal, Vessell contended that this show-up identification procedure was unconstitutionally suggestive, but the supreme court upheld the show-up:

> [W]e believe that the criteria for admissibility were satisfied. The victims of the robbery ... had ample opportunity to view the man who robbed them. The description that they gave to the police immediately after the robbery was detailed and accurate, although they differed slightly on the exact type of boots that the robber wore. In addition, the show-up took place within minutes after the robbery had occurred. Finally, both [witnesses] were positive in their statements that Vessell wore the same clothing as the man that robbed them, although neither claimed that he could recognize Vessell's facial features.

*Vessell*, 624 P.2d at 279.

In Haag's case, the show-up took place within minutes of the crime. Although Holly Holder was "peeking" at the robbers, she was only about five feet from them, and they assumedly had her full attention. Moreover, Holder stood by her identification of Haag as one of the robbers even after she realized, a few moments later, that she had just incriminated someone whom she knew personally. Based on these facts, and based on the su-

preme court's handling of a similar identification procedure in *Vessell*, we uphold the show-up in Haag's case.

*Underlying facts pertaining to Haag's sentencing, and the issues he raises on appeal*

Haag was convicted of three felonies: first-degree robbery, tampering with evidence, and fourth-degree controlled substance misconduct (for possessing Holland's bottle of prescription medicine).

As a first felony offender, Haag was subject to presumptive sentencing under AS 12.55.125(c) for the robbery conviction, because first-degree robbery is a class A felony.[7] Haag faced a presumptive term of 7 years' imprisonment for this crime.[8]

Haag was not subject to presumptive sentencing for his other two crimes, because these crimes are class C felonies,[9] and because there is no presumptive term for first felony offenders convicted of class C felonies.[10] However, Haag's sentencing for these two other crimes was governed by AS 12.55.125(k)(2), which declares that, in the absence of aggravating factors or extraordinary circumstances, when a first felony offender is not subject to presumptive sentencing, their sentence should not entail more time to serve than the presumptive term established for second felony offenders convicted of the same crime.

At Haag's sentencing, the State did not propose any aggravating factors with respect to Haag's convictions for evidence tampering or controlled substance misconduct. However, the State proposed one aggravating factor with respect to Haag's conviction for robbery. This aggravating factor was AS 12.55.155(c)(5)—that Haag knew or reasonably should have known that the victim of the robbery was particularly vulnerable or incapable of resistance due to disability or ill health.

---

6. *Vessell*, 624 P.2d at 277.

7. AS 11.41.500(b).

8. AS 12.55.125(c)(2)(A).

9. AS 11.56.610(b) (evidence tampering); AS 11.71.040(d) (fourth-degree controlled substance misconduct).

10. *See* AS 12.55.125(e).

Haag disputed this aggravating factor, but the sentencing judge ultimately concluded that the State had proved the aggravating factor by clear and convincing evidence. Based on this aggravator, the judge increased Haag's sentence for the robbery by adding 3 years of suspended imprisonment to the 7–year presumptive term. (That is, Haag's sentence for the robbery was 10 years with 3 years suspended.)

For evidence tampering, Haag received 2 years with 1 year suspended (*i.e.*, 1 year to serve). And for controlled substance misconduct, Haag received 18 months with 12 months suspended (*i.e.*, 6 months to serve). The sentencing judge ordered that this additional time to serve—18 months—would be consecutive to Haag's robbery sentence, but that the additional suspended time—2 years—would be concurrent to Haag's suspended time for the robbery.

Thus, all told, Haag received a composite sentence of 8½ years to serve, with an additional 3 years suspended.

■ Haag argues that this composite sentence is mistakenly severe. He also argues that, when the superior court increased his robbery sentence based on the disputed aggravating factor, the superior court violated the Sixth Amendment to the United States Constitution as interpreted in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

### The Blakely issues

In *Blakely v. Washington*, the Supreme Court held that the Sixth Amendment to the United States Constitution guarantees criminal defendants a right to jury trial on all factual issues that are necessary to establish a sentencing judge's authority to impose the type of sentence that the defendant received. Thus, when a sentencing judge has no authority to exceed a specified sentencing ceiling unless particular aggravating factors are proved, the defendant has a right to demand a jury trial on those aggravating factors (with the exception of prior criminal convictions). *Blakely*, 124 S.Ct. at 2537–38. If the defendant is denied this right, then the sentencing judge can not exceed the prescribed statutory ceiling. *Id.* at 2538.

(We recently discussed this aspect of the *Blakely* decision in *State v. Gibbs*, 105 P.3d 145, 147–48 (Alaska App.2005).)

Alaska's pre–2005 presumptive sentencing laws are directly affected by the *Blakely* decision—because, under those laws, if a felony defendant was subject to a presumptive term of imprisonment, the superior court had no authority to increase that term of imprisonment (even by the addition of suspended imprisonment) unless the State proved one or more of the aggravating factors listed in AS 12.55.155(c), or unless the State proved extraordinary circumstances as defined in AS 12.55.165. The pre–2005 versions of AS 12.55.125(c), (d), (e), and (i) all declared: "a defendant convicted of [the specified felony] *shall be sentenced to the following presumptive terms*, subject to adjustment as provided in AS 12.55.155–175"—that is, subject to adjustment for the aggravating and mitigating factors listed in AS 12.55.155(c)-(d), or for extraordinary circumstances as defined in AS 12.55.165.

Thus, under Alaska's pre–2005 presumptive sentencing law, proof of aggravating factors (or proof of extraordinary circumstances favoring the government) expanded the range of sentences available to the superior court—to the defendant's detriment. *Blakely* holds that, under such a sentencing scheme, a defendant has the right to a jury trial on these factors (with the exception of prior convictions). But under Alaska's pre–2005 presumptive sentencing laws, all rulings on aggravating and mitigating factors, and all rulings on extraordinary circumstances (whether favoring the government or the defendant), were made by the sentencing judge. Thus, Alaska's pre–2005 presumptive sentencing laws provided for sentencing procedures that violated the Sixth Amendment as interpreted in *Blakely*.

Moreover, *Blakely* declares that when the defendant's sentencing range hinges on contested aggravating factors, the government is obliged to prove these triggering aggravating factors beyond a reasonable doubt. *Blakely*, 124 S.Ct. at 2536, 2542. The Supreme Court recently reiterated this rule in *United States*

*v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005): "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S.Ct. at 756.

On this point as well, Alaska's pre–2005 presumptive sentencing laws provided for sentencing procedures that violated the Sixth Amendment as interpreted in *Blakely*—because, under AS 12.55.155(f) and AS 12.55.165(a), aggravating and mitigating factors, and extraordinary circumstances (whether favoring the government or the defendant), did not have to be proved beyond a reasonable doubt, but rather only by clear and convincing evidence.

As explained above, Haag faced a 7–year presumptive term for first-degree robbery. If no aggravating factors had been proved, this 7–year presumptive term would have been the ceiling on the amount of imprisonment that Haag could receive. But based on the State's proof of aggravator (c)(5) (particularly vulnerable victim), the superior court ultimately increased Haag's sentence to 10 years with 3 years suspended—that is, the court added 3 years of suspended imprisonment to Haag's 7–year presumptive term.

Haag was sentenced in July 2003, approximately eleven months before the Supreme Court decided *Blakely*. Thus, in accordance with Alaska's sentencing laws at that time, Haag's sentencing judge (not a jury) resolved the disputed aggravator, and the judge applied a "clear and convincing evidence" standard of proof rather than requiring the government to prove the disputed aggravator beyond a reasonable doubt. In both of these two respects, Haag's sentencing violated the Sixth Amendment as construed in *Blakely*.

■ It may come as no surprise that Haag failed to object to these aspects of his sentencing in July 2003, since the *Blakely* decision was still eleven months in the future. However, under federal law, "a new rule for

the conduct of criminal prosecutions [applies] retroactively to all cases, state or federal, pending on direct review or not yet final". *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

■ The scope of the retroactivity of constitutional decisions of the United States Supreme Court is governed by federal law. *See American Trucking Associations, Inc. v. Smith*, 496 U.S. 167, 177, 110 S.Ct. 2323, 2330, 110 L.Ed.2d 148 (1990). Thus, we are bound by the rule of retroactivity stated in *Griffith v. Kentucky*.

Haag's direct appeal was pending at the time that *Blakely* was decided. Accordingly, Haag may seek relief based on the fact that the sentencing procedures employed in his case did not comport with *Blakely*. However, because Haag did not object to these sentencing procedures at the time, he must now show plain error.[11]

The State advances two arguments why the sentencing procedures in Haag's case do not constitute plain error (even though these procedures violated the Sixth Amendment).

First, the State argues that Haag's *Blakely* challenge is not yet ripe. The State points out that Haag received no additional time to serve because of the aggravating factor—only 3 years of suspended imprisonment. The State further points out that Haag was convicted of two other crimes besides the robbery, and that Haag received a concurrent 1 year of suspended jail time from these other two convictions. Thus, Haag's robbery sentence really only added 2 years of suspended imprisonment to his total sentence. Finally, the State points out that, presently, there is no way to know whether Haag will ever violate his probation and be required to serve any portion of this additional 2 years of suspended jail time.

The State's argument overlooks the fact that, absent the disputed aggravating factor, the superior court would have had no authority to impose *any* suspended jail time for the robbery conviction, nor any authority to place Haag on probation for this offense

---

**11.** *Johnson v. United States,* 520 U.S. 461, 466–68, 117 S.Ct. 1544, 1548–49, 137 L.Ed.2d 718 (1997).

after he completed his 7 years to serve. (There were no mitigating factors in Haag's case. Haag proposed two mitigating factors, but the superior court found that neither of them was proved.) Thus, Haag's *Blakely* claim involves a live controversy.

The State next argues that the *Blakely* violations do not constitute plain error because, under the facts of Haag's case, these violations could not have possibly affected the outcome—that is, they could not have possibly affected the decision on the State's proposed aggravating factor.

To recapitulate, the two *Blakely* violations in this case were that the disputed aggravator was resolved by the sentencing judge, and that the sentencing judge applied the "clear and convincing evidence" standard of proof instead of requiring proof beyond a reasonable doubt. The State contends that Haag never disputed—or, at least, never seriously disputed—the factual basis of the proposed aggravator (particularly vulnerable victim). The State concludes that, because there was no real dispute concerning the facts that made Bert Holland a particularly vulnerable victim, *any* trier of fact (judge or jury) would inevitably have ruled against Haag on this issue, even if the State was required to present proof beyond a reasonable doubt.

There is case law to support this type of harmless error argument. In *Johnson v. United States*, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), the defendant was prosecuted for perjury. Under the federal perjury statute, the government must prove that the defendant made a knowingly false statement under oath, and that this statement was material.[12] At the time of Johnson's trial, the settled law among federal courts was that the trial judge, and not the jury, should decide whether the defendant's false statement was material.[13] In accor-

dance with this law, Johnson's trial judge considered this issue, decided that Johnson's statement was material, and then instructed the jury that the question of materiality had been decided against Johnson.[14]

While Johnson's case was on appeal, the Supreme Court decided *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). *Gaudin* held that defendants charged with perjury under the federal statute were entitled to have the jury decide whether the false statement was material— just as the jury decided every other element of the crime.[15] The question, then, was whether Johnson could claim the benefit of this ruling.

Even though Johnson's trial judge had followed settled law when he took the issue of materiality from the jury and decided it himself, it was clear in retrospect that this procedure violated Johnson's right to trial by jury. The Supreme Court held that, in these circumstances, the trial judge's action constituted plain error in the sense that the error was clear by the time Johnson's appeal came up for decision.[16]

However, the Supreme Court also held that, under the facts of Johnson's case, there was "no basis for concluding that the error seriously affect[ed] the fairness, integrity, or public reputation of [the] judicial proceedings."[17] The Court pointed out that "the evidence supporting [a finding of] materiality was overwhelming"; in fact, "[m]ateriality was essentially uncontroverted at [Johnson's] trial and ... remained so on appeal".[18] In other words, even though the trial judge committed constitutional error by taking the issue of materiality from the jury and deciding it himself, there was no miscarriage of justice.[19] For this reason, the Supreme Court affirmed Johnson's conviction.

---

12. 18 U.S.C. § 1623 (1994).

13. *See, e.g., United States v. Molinares*, 700 F.2d 647, 653 (11th Cir.1983).

14. *Johnson*, 520 U.S. at 464, 117 S.Ct. at 1547.

15. *Gaudin*, 515 U.S. at 522–23, 115 S.Ct. at 2320.

16. *Johnson*, 520 U.S. at 467–68, 117 S.Ct. at 1549.

17. *Id.*, 520 U.S. at 470, 117 S.Ct. at 1550 (internal quotations omitted).

18. *Id.* (internal quotations omitted).

19. *Id.*

The State argues that Haag's case is similar—that even though Haag's aggravator was decided by the sentencing judge rather than a jury, and even though the judge applied a lesser standard of proof than the constitutionally mandated standard of proof beyond a reasonable doubt, there was no miscarriage of justice because there is essentially no chance that a jury, applying the correct standard of proof, would have reached a different decision.

We find the State's argument unconvincing. In contrast to *Johnson*, where the question of the false statement's materiality was straightforward and the answer was self-evident, the issue presented in Haag's case—whether Haag "knew or reasonably should have known that [Holland] was particularly vulnerable or incapable of resistance"—required the finder of fact first to assess the extent of Holland's physical incapacity and then to assess Holland's physical ability to resist in comparison to the physical ability of a typical robbery victim.

Both of these assessments turn on matters of degree. Thus, the ultimate conclusions as to whether Holland was particularly vulnerable or incapable of resistance to armed robbery, and whether Haag knew or reasonably should have known this, could easily be affected by the identity of the fact finder (judge versus jury) and could easily be affected by the State's burden of proof ("clear and convincing evidence" versus "beyond a reasonable doubt").

We therefore conclude that, under the facts of Haag's case, the sentencing judge's resolution of aggravator (c)(5), using the "clear and convincing evidence" standard of proof, constituted plain error. Accordingly, Haag must be re-sentenced for first-degree robbery.

We do not resolve the issue of whether, at this time, it would be permissible for the superior court to hold a jury trial on the disputed aggravator. If the State wishes to ask for such a trial, that issue can be litigated in the superior court. Alternatively, the State may ask the superior court to re-sentence Haag without reliance on the disputed aggravator—meaning that Haag would receive the prescribed 7–year presumptive term for his robbery conviction. *See Allain v. State*, 810 P.2d 1019, 1021–22 (Alaska App. 1991).

We retain jurisdiction of Haag's case. The superior court shall re-sentence Haag within the next 90 days, and the superior court shall notify us of its action.

Within 30 days of this re-sentencing, Haag shall notify us whether (1) he no longer wishes to challenge his composite sentence as unlawfully severe, or (2) he wishes to again assert that his composite sentence is unlawfully severe.

If Haag no longer wishes to challenge his composite sentence, we will close this case.

On the other hand, if Haag decides to renew his challenge to his composite sentence, his notice should include a request for transcription of the appropriate portions of the superior court proceedings. After the preparation of that transcript, Haag will have 30 days to file a sentencing memorandum, and the State will have 30 days to file a responsive memorandum. We will then decide Haag's sentence appeal.

Haag's three convictions are AFFIRMED. Haag's sentence for first-degree robbery is VACATED, and his case is remanded to the superior court for re-sentencing.