**Frank Moses TEGOSEAK, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–10074.

Court of Appeals of Alaska.

Dec. 11, 2009.

---

Tracey Wollenberg, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Eric A. Ringsmuth, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for the Appellee.

1. AS 28.35.030(n) and AS 28.15.291(a)(1), re-

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

Following a jury trial, Frank Moses Tegoseak was convicted of felony driving under the influence and driving with a suspended license.[1] Both the grand jury that indicted Tegoseak and the trial jury that convicted him heard the testimony of Robert Maestas, a private citizen who observed a Ford Bronco being driven in an obviously impaired manner, and who later identified Tegoseak from a photographic lineup as having driven the Bronco.

In pre-trial motions, Tegoseak argued that the photographic lineup was conducted in an unduly suggestive manner and that the superior court should therefore suppress Maestas's identification of Tegoseak as the driver. The superior court, employing the test set forth in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), concluded that Maestas's identification of Tegoseak was reliable despite the arguable flaws in the way the photo lineup was conducted. The court therefore denied Tegoseak's motions and allowed evidence of the identification to be admitted at Tegoseak's trial.

We agree with Tegoseak that there are troublesome aspects to the photographic lineup procedure in this case. In addition, we are aware that scientific research conducted during the past thirty years has cast doubt on the analysis set forth in *Manson v. Brathwaite*—raising questions as to whether that analysis is a valid method for ascertaining whether a photographic lineup has yielded a reliable identification. Nevertheless, we conclude that any potential suggestiveness in the photo lineup in Tegoseak's case was harmless beyond a reasonable doubt, and we therefore affirm Tegoseak's convictions.

*Underlying facts*

On June 19, 2005, Robert and Michelle

spectively.

Maestas[2] were driving around the Anchorage area, looking for a house to purchase. They observed a Ford Bronco that was traveling slower than normal. While they watched, the Bronco swerved and repeatedly changed lanes without apparent cause.

The Maestases could see three occupants in the vehicle: two males in the front seat, and another person in the back seat. Using her cell phone, Michelle Maestas called the Anchorage Police dispatcher to report this vehicle because she and her husband thought that the driver was drunk.

After making this call to the police, the Maestases temporarily lost sight of the Bronco, but they came upon it again a few moments later. It was still being driven in an erratic manner. The Maestases then decided to follow the car. Michelle Maestas called the Anchorage police once more, and this time she remained on the line to assist officers in locating the Bronco as it continued to travel through Anchorage.

The Maestases followed the Bronco to the parking lot of Bell's Nursery on DeArmoun Road, where the Bronco stopped. Robert Maestas parked the couple's car near the nursery parking lot in order to keep an eye on the Bronco while they waited for the police to arrive.

While the Bronco was parked in the Bell's Nursery parking lot, Mr. and Mrs. Maestas saw the driver and the front-seat passenger emerge from the Bronco and swap places. While these two men were outside the vehicle, Robert Maestas was able to observe them.

Maestas described both males as having dark or black hair. He described the man who was originally driving the Bronco (and who switched to the passenger seat in the nursery parking lot) as having a "slender build" and "wearing a black shirt". Maestas described the other man (that is, the man who was originally in the passenger seat of the Bronco, and who began driving the vehicle after the switch in the nursery parking lot) as "a heavier set gentleman" who was wearing a "white ... T-shirt".

After the two men switched places in the Bronco, the Bronco left the nursery parking lot and headed east on DeArmoun Road. Just after the Bronco started up DeArmoun, Anchorage Police Officer Gerald Asselin arrived and conducted a traffic stop of the vehicle.

When Officer Asselin stopped the Bronco, he found that there were two men and one woman inside the vehicle. The man driving the vehicle was wearing a white T-shirt, and the male passenger was wearing a black shirt. The driver was later identified as Edgar Henry, while the passenger was identified as Tegoseak.

Because his dispatcher had informed him that the driver and passenger had just switched places, Officer Asselin questioned both men about who had been driving the Bronco before the vehicle stopped at Bell's Nursery. Based on the men's responses (both verbal and non-verbal), Asselin concluded that Tegoseak had been driving the vehicle prior to the stop at Bell's. In particular, as Asselin later testified, Edgar Henry told the police that he had taken over driving the Bronco after the stop at Bell's Nursery because Tegoseak had been driving so poorly that he thought Tegoseak was going to kill them.

Officer Asselin conducted field sobriety tests of both Henry and Tegoseak. Based on the results of these tests, the officer concluded that he had probable cause to arrest both men. A subsequent breath test showed that Tegoseak had a blood alcohol content of .227 percent (in other words, just under three times the legal limit).[3]

One week later, on June 26th, Officer Asselin contacted Robert and Michelle Maestas and asked them to view a photographic lineup to see if they could identify the two men in the Bronco. This photo lineup was comprised of two separate arrays of six pho-

---

**2.** Robert and Michelle Maestas were formerly known as Robert and Michelle Mayer; they changed their names prior to Tegoseak's trial. Thus, in the grand jury transcript, they are referred to as "Mayer". But at trial, and in the parties' briefs to this Court, they are referred to by their current names.

**3.** *See* AS 28.35.030(a)(2).

tographs each. The two arrays were composed so that each of them contained a photograph of one of the men in the Bronco. (The first array contained a photograph of Edgar Henry in position number 5; the second array contained a photograph of Frank Tegoseak in position number 5.)

Asselin showed the photo arrays to Mr. and Mrs. Maestas separately. He told them that he would show them two photo arrays, and he asked them to let him know if they "recognize[d] any of those individuals as being involved." When Asselin showed the first array to Mr. and Mrs. Maestas, he reminded them that, if they did not recognize anyone from the first array of six photographs, he had a second set of photographs to show them.

After Michelle Maestas examined the two arrays of photographs, she picked one person from among the twelve photographs as having been in the Bronco—but that person was neither Henry nor Tegoseak.

After Michelle Maestas failed to identify either Henry or Tegoseak, Officer Asselin showed the photographs to Robert Maestas.

When Robert Maestas was shown the first array of six photographs, he selected *three* people from this array as the possible occupants of the Bronco. Maestas told Asselin, "[I]t could have been [number] 1 or 3 that was driving [the Bronco originally], and [number] 5 that was in the passenger seat.... I think [that], between 1 and 3, those two [photographs] kind of look like the driver that we originally pulled up next to."

The three photographs that Maestas selected were of Edgar Henry and two "fillers"—that is, two people whose photographs were included, not because the police suspected that they were connected to this incident, but rather to fill out the six-photograph array.

At this point—that is, after Maestas had apparently identified both the original driver and the original passenger from among the photographs in the first array—Asselin said to Maestas, "Let me try to at least show you [the second array of photographs]; then you can see the entire compilation of photos. So far, you've said [that] 1 and 3 [in the first array] could be the driver." Asselin then showed Maestas the second array of six photographs.

When Maestas looked at the second array of photos, he told Asselin that photograph number 5 in this second array could also potentially be the initial driver of the Bronco (that is, the man who was driving before the driver and passenger switched places in the nursery parking lot). Maestas told Asselin that the man "originally driving the car" was "either [number] 5 in [the second array] or [number] 1 in [the first array]." (As we explained above, Tegoseak's picture was number 5 in the second photo array.)

Asselin asked Maestas to memorialize his identifications on two different "Photographic Lineup" forms. These forms (one for each of the two arrays) apparently had boxes on them that corresponded to the photographs in the arrays. Asselin asked Maestas to place a check mark on the boxes that corresponded to the photographs he had selected.

On the first of these forms (*i.e.*, the form that corresponded to the first photo array), Maestas stated that he identified photograph number 5 in the first array as the man who began driving the Bronco *after* the car stopped at the nursery. (As explained above, this photograph was of Edgar Henry.)

Asselin then handed Maestas the second form (*i.e.*, the form corresponding to the second photo array). Although Maestas had told Asselin that he was uncertain whether the original driver of the Bronco was photograph number 1 from the first array or photograph number 5 from the second array, Asselin directed Maestas to put a check mark in only one box—the box corresponding to photograph number 5 from the second array.

Asselin invited Maestas to add a handwritten notation explaining his uncertainty about the identification. Maestas wrote on the form, "When looking at the photos, both [photograph] # 5 on [the second array] and [photograph] # 1 on [the first array] look similar to the original driver that we ... first [saw]."

However, Officer Asselin added his own separate notation to this form. In the officer's notation, he indicated that Maestas had

made an identification from the photographs, and that the person Maestas had identified was Frank Tegoseak (who, as we explained above, was photograph number 5 in the second array). Maestas signed this form.

This same ambiguity concerning the nature or precision of Maestas's identification is reflected in the testimony given by Asselin and Maestas at the evidentiary hearing.

At the hearing, Asselin testified that he did not remember the exact exchange between himself and Maestas, "but it was clear to [him], based upon the [conversation], that [Maestas] identified [photograph] number 5 [in the second array] as being ... the person who was originally driving the vehicle." Asselin conceded that, while he was showing the photographs to Maestas, "there was some conversation ... where [Maestas] would say, 'Well, [photograph] number 1 [in the first array] looks very similar', but [Maestas] came back to it being [photograph] number 5 [in the second array]."

When Maestas testified at the evidentiary hearing, he acknowledged that he was hesitant to positively identify either photograph 1 from the first array or photograph 5 from the second array—"because the two photos look similar, ... and [because it was] a week [after the incident]." When Maestas was asked whether he had made a "positive identification", he responded, "I wouldn't say it was 100 percent positive; no."

After hearing this testimony, and after listening to Officer Asselin's tape recording of the photo lineup procedure, Superior Court Judge Michael L. Wolverton concluded that the photo lineup procedure was not unduly suggestive.

In particular, Judge Wolverton found that the "filler" photographs were well-selected (in the sense that the people depicted in these filler photographs were visually similar to the two suspects). The judge suggested that this fact (the good selection of fillers) was potentially the explanation for Robert and Michelle Maestas's difficulty in selecting Henry and Tegoseak from among the photographs.

Judge Wolverton also concluded that there was nothing wrong in Officer Asselin's act of drawing Robert Maestas's attention to the second array after Maestas had already declared that the first array contained photographs of both suspects. The judge found that Asselin was not trying to suggest that Maestas had chosen prematurely, or to suggest that the second array contained a photograph of at least one of the suspects. Rather, Judge Wolverton found that Asselin was simply "trying to explain" the procedure (*i.e.*, the need to examine both arrays) and to request that Maestas withhold his final judgement until he had seen all twelve of the photographs.

Judge Wolverton also concluded that, given the circumstances of the case, there was essentially no possibility of a misidentification. The judge remarked that "this might [have been] a different situation if [the occupants of the Bronco] had not been followed and [immediately arrested]—almost like a hand-off to the police—[but] we know who was in the vehicle [when] it was stopped, [and the photo lineup] was [merely] a determination as to ... who was driving when"—a determination that was made "easier ... because one [man] was wearing a white shirt and [the other] was wearing a black shirt."

*Tegoseak's claim that his indictment is flawed because the prosecutor did not inform the grand jury that Michelle Maestas failed to identify Tegoseak as one of the men in the Bronco, and that Robert Maestas's identification of Tegoseak was less than certain*

■ Under Alaska law, a prosecutor must inform the grand jury of exculpatory evidence known to the government.[4] Tegoseak contends that the prosecutor in his case violated this duty in two ways. First, Tegoseak argues that the prosecutor was required to tell the grand jury that Michelle Maestas had not identified Tegoseak as one of the men in the Bronco—and that, in fact, the only man she identified as having been in the Bronco

---

4. *Cameron v. State,* 171 P.3d 1154, 1157 (Alaska 2007); *Frink v. State,* 597 P.2d 154, 164–66 (Alaska 1979).

was a "filler". Second, Tegoseak argues that the prosecutor was required to tell the grand jury that Robert Maestas's identification of Tegoseak was less than certain.

■ For purposes of defining a prosecutor's duty to present evidence to the grand jury, we have defined the term "exculpatory evidence" narrowly: it means only the type of evidence "that tends, in and of itself, to negate the defendant's guilt".[5] Thus, we have held that a witness's failure to identify the defendant as the perpetrator of the crime, or the fact that a witness's post-event description of the perpetrator did not match the defendant, was not "exculpatory evidence", given the other evidence linking the defendant to the crime.[6]

For example, in *Haag v. State*, 117 P.3d 775 (Alaska App.2005), the defendant (who was white) argued that the prosecutor violated the duty to present exculpatory evidence because the prosecutor failed to inform the grand jurors that a witness to the crime initially reported that the two perpetrators were black. *Id.* at 777–78. We held that, in the context of the other evidence linking Haag to the crime, the witness's description of the perpetrators as black was not exculpatory: "The fact that [the witness] initially stated that both robbers were black is certainly something that a defense attorney might use to attack [the witness's] later identification of Haag as one of the robbers. But this is not information that *negates Haag's guilt in and of itself.*" *Haag*, 117 P.3d at 778 (emphasis added).

In Tegoseak's case, the police responded quickly to the Maestas's report of the Bronco being driven in an erratic manner, and there is essentially no doubt that, when the police stopped the Bronco, the vehicle contained the same people that Michelle and Robert Maestas had observed minutes before. As Judge Wolverton noted when he issued his rulings on Tegoseak's pre-trial motions, there is essentially no possibility that Tegoseak was misidentified as one of the drivers of the Bronco.

■ Given these circumstances, it is extremely unlikely that the grand jurors' decision to indict Tegoseak would have been altered if they had known that Michelle Maestas identified another man's photograph in the photo lineup, or if they had known that Robert Maestas's identification of Tegoseak's photograph was uncertain. For this reason, either the evidence that Tegoseak complains of was not "exculpatory" as that term is defined in our cases, or the State's failure to apprise the grand jurors of this evidence was harmless.

*Tegoseak's claim on appeal, and a preliminary discussion of the problems that can be encountered in post-crime eyewitness identification*

On appeal, Tegoseak renews his argument that the photographic lineup procedure was unduly suggestive, and he further argues that when the facts of the case are analyzed under the factors set forth in *Brathwaite*, this analysis fails to demonstrate that Robert Maestas's identification of him was reliable.

The photographic lineup in this case does not appear to be overtly suggestive. As Judge Wolverton noted when he denied Tegoseak's suppression motion, the ten filler photographs are quite similar to the two suspects' photographs in facial characteristics and hair style. In other words, Henry's and Tegoseak's photographs did not stand out from the filler photographs in such an obvious way as to practically single out these two men as the suspects.

■ But even though a photographic lineup may not be overtly suggestive, the procedure by which the photographs are selected, the procedure by which a photo lineup is displayed to a witness, and the procedure by which the witness's identification is elicited, can engender suggestiveness—even when

**5.** *See, e.g., Cathey v. State,* 60 P.3d 192, 195 (Alaska App.2002); *State v. McDonald,* 872 P.2d 627, 639 (Alaska App.1994).

**6.** *See, e.g., Wilkie v. State,* 715 P.2d 1199, 1201–02 (Alaska App.1986); *Tookak v. State,* 648 P.2d 1018, 1020–21 (Alaska App.1982). *See also* *Abruska v. State,* 705 P.2d 1261, 1272–73 (Alaska App.1985) (holding that the victim's potentially contradictory statements about whether it was the defendant who shot him were not exculpatory evidence).

this is not the intention of the officer conducting the lineup.

Medical researchers have long recognized the phenomenon that testers influence the persons they are testing. Even though one might think that a test subject's physical reaction to an experimental drug or therapy would remain the same regardless of the mental attitude or desires of the researchers, the truth is that the researchers' expectations regarding the experiment *do* make a difference to the result.

One well-known problem is the "placebo effect": the recognized phenomenon that when a person *believes* that they are receiving an effective drug or therapy, their body will physically react in accordance with their belief—even though the substance or treatment they are receiving would ordinarily do nothing to alleviate their condition.

But the placebo effect is compounded by another difficulty known as the "Clever Hans effect". This is the problem that researchers, because of their knowledge of the experiment and their expectations concerning the outcome, can unintentionally influence the responses of the test subjects—by unconscious signaling, or by small differences in how they interact with test subjects who are receiving the real drug or therapy as opposed to a placebo.[7]

7. In 1891, William von Osten began displaying his horse, "Clever Hans", to the public. Hans would answer questions by tapping his hoof—either by tapping out a number, or by tapping out the letters of the alphabet that corresponded to the answer (with one tap equaling "A", two taps equaling "B", and so on). Hans could apparently perform mathematical calculations, tell time, identify musical intervals, and name people.

Von Osten did not intend to trick people. He believed that animals possessed an intelligence equal to that of humans—and, in his quest to prove this, he attempted to teach many animals how to do simple calculations. However, Clever Hans was the only animal who showed any ability.

The first scientific test of Hans's ability was conducted in 1904 by Professor Carl Stumpf. Stumpf looked for evidence of cheating or trickery to explain Hans's ability, but he found none, and he subsequently endorsed Hans's abilities as genuine. Following Professor Stumpf's endorsement, Clever Hans became a sensation, and people flocked to see him.

In 1907, a group of thirteen scientists (the "Hans Commission") re-tested Clever Hans. Their test is now recognized as a classic experiment in psychology.

Because there was no evidence of connivance or cheating, the scientists began with the assumption that Hans did have an ability of some kind, and they designed their experiment to find out what this ability was.

Hans was tested inside a large tent to avoid outside distractions, such as spectators. The experiment was designed in the following way:
• A large number of questions were used, to eliminate the effects of chance;
• Different people posed these questions, in case Hans was picking up signals from his owner, von Osten;
• The questioners sometimes knew the answers to the questions they were asking, but other times they did not;
• The questioners would stand at different distances from Hans during different trials; and
• Some trials were run with Hans blinkered.

The first important finding was that Clever Hans needed to have visual contact with the questioner in order to answer correctly. The farther away the questioner stood, the less accurate Hans became. And when Hans's peripheral vision was obstructed by blinkers, his ability to answer was diminished even further.

The other major finding was that Hans could only answer a question correctly if the questioner also knew the answer to the question. When the questioner did not know the answer to the question, Hans could not give the answer.

These facts—that Hans could only answer a question correctly if it was posed by a questioner who knew the answer, and only if Hans could see the questioner—led the psychologists to perceive that Hans was not using intelligence to work out the answers; rather, he was responding to visual cues given unwittingly by the questioner. These unwitting visual cues took the form of increases or decreases in the tension of the questioner's body, changes in the questioner's facial expression, and other involuntary movements that the questioner would make when Hans reached the right answer.

The results of the experiment with Clever Hans led the scientists to the key insight that an animal's—or a person's—behavior can be influenced by subtle and unintentional cues given by a questioner or researcher.

This effect—now known as the "Clever Hans effect"—is one of the primary reasons why scientific tests (and, in particular, clinical trials) must be done using a "double-blind" method: a procedure in which neither the questioner/researcher nor the subject being tested knows the nature of the information required or the treatment being administered.

Source: John Jackson, "Clever Hans" (2005), available at:
www.skeptics.&1forg.uk/article.php?dir= articles & article=clever—hans.php

In the late 1980s (that is, approximately ten years after the Supreme Court issued its decision in *Brathwaite*), Professor Gary L. Wells of Iowa State University noted that photographic lineups could be affected by these same difficulties—that the police officers who conducted photographic lineups could unwittingly be influencing the witnesses they were interviewing. Professor Wells accordingly proposed that photo lineups (like medical trials) should be conducted using a double-blind procedure.[8] In other words, (1) the lineup should be conducted by an officer who does not know which photograph in the lineup represents the suspect and which photographs are fillers, and (2) because witnesses will naturally assume that any photo lineup will contain a photograph of the person whom the police suspect, the witness must affirmatively be told that the lineup may not contain a photograph of the perpetrator.

In his article, "The Double–Blind Lineup: General Comments and Observations" (2008),[9] Professor Wells notes that police officers can inadvertently (and often unconsciously) influence witnesses by such seemingly innocuous comments as, "I noticed you paused on photograph number 3". Or, when a witness hesitates between two or three photographs, the officer might say to the witness, "Tell me about photograph 2"—directing the witness's attention to the photograph that the officer knows is the suspect, rather than to one of the fillers. Or, when the witness has picked a filler, the officer might ask, "Is there any other photograph that stands out to you?"—a question that obviously would not be asked if the witness had selected the suspect.

According to Professor Wells, there are currently close to 200 cases in which (1) the police identified a person as the suspected perpetrator of a crime, (2) the suspect was included in a photographic or live lineup, (3) the witness who viewed the lineup identified the suspect as the perpetrator, (4) the suspect was convicted, but (5) post-trial DNA testing proved that the suspect was innocent.

One of these cases recently received national publicity through the publication of the book, *Picking Cotton*,[10] and the related story that aired in March 2009 on the CBS television news show "60 Minutes".[11]

As described in the 60 Minutes story, in the summer of 1984, a man broke into Jennifer Thompson's apartment and raped her at knife-point. During the attack, Thompson forced herself to stay alert and study this man carefully—his physical characteristics, his voice, his accent—so that, if she survived, she could make sure that he was convicted and sentenced to prison. After about half an hour, Thompson tricked the rapist into letting her get up to fix him a drink; she then took the opportunity to escape from her apartment through the back door.

Police Detective Mike Gauldin interviewed Thompson at the hospital, and he worked with Thompson to assemble a composite sketch of the rapist. After the sketch was broadcast, the police started to receive tips about the crime. One of these tips was about a young man named Ronald Cotton. Cotton worked at a restaurant near Thompson's apartment, and he had a previous conviction for breaking and entering, as well as a juvenile record for sexual assault.

Three days after the rape, Detective Gauldin assembled a six-photograph lineup that contained Cotton's picture, and then he called Thompson to come view the lineup. Thompson studied the photographs for about

8. Gary L. Wells, *Eyewitness Identification: a system handbook* (Carswell Legal Publications, 1988); Gary L. Wells & C.A. Elizabeth Luus, "Police Lineups as Experiments: Social methodology as a framework for properly conducted lineups", 16 Personality and Social Psychology Bulletin 106–117 (1990).

9. Available at: www.psych ology.iastate.edu/g̃lwells/homepage.htm, through the link "Meet the double-blind lineup".

10. Jennifer Thompson–Cannino & Ronald Cotton, with Erin Torneo, *Picking Cotton: Our Memoir of Injustice and Redemption* (St. Martin's Press, 2009).

11. Both the video and the text of the 60 Minutes story, "Picking Cotton" (originally aired in March 2009) are available at:

www.cbsnews.com/stories/2009/03/06/60 minutes/main4848039.shtml

five minutes, and then she identified Cotton as the man who had raped her.

Thompson subsequently picked Cotton from a live lineup. After Thompson made the live lineup identification, the police informed her that she had picked the same man that she previously selected from the photo lineup. When she heard this, Thompson remembers thinking, "Bingo! I did it right; I did it right."

Later, Thompson identified Cotton again when she testified at his trial. Cotton was convicted and sentenced to life imprisonment plus 50 years.

While in prison, Cotton met a man named Bobby Poole. Poole looked very similar to Cotton; in fact, some of the prison stewards mistook them for each other. Then Cotton heard, from a fellow inmate, that Poole had admitted raping Thompson. Based on this information, Cotton received a new trial.

At the new trial, Cotton's lawyers summoned Bobby Poole to court so that Jennifer Thompson could see him. But when Thompson looked at Poole, she did not recognize him. Indeed, she felt nothing but anger toward Cotton and his attorneys. She remembers thinking, "How dare you question me? How dare you [suggest that I] could possibly have forgotten what my rapist looked like? ... The one person [I] would never forget?"

Cotton was again convicted. This time, he received two life sentences.

Seven years later (ten years after the rape), Cotton watched the O.J. Simpson trial on television and learned about DNA. He convinced his lawyer to investigate the possibility of DNA testing. By luck, the Birmingham, North Carolina police still had the rape kit, and the kit contained enough viable sperm to conduct a DNA test. The result: Bobby Poole was indeed the rapist—and Ronald Cotton was innocent.

For people who care about our justice system, this is a bittersweet tale. A man spent a decade in prison for a crime he did not commit—and yet he was finally exonerated, and he has even become reconciled with the woman whose testimony sent him to prison. Cotton and Thompson are now friends; they co-authored the book *Picking Cotton*, which describes the case, and they are prominent advocates of reform in police identification practices.

But for the judges and lawyers who administer and actively participate in the criminal justice system, this story has a more fundamental and disquieting aspect. What happened in Ronald Cotton's case lends anecdotal support to the scientific research that casts doubt on the validity of the *Brathwaite* method for assessing the reliability of eyewitness identifications.

*The test established by the Supreme Court in Manson v. Brathwaite, and how this test relates to the facts of the Ronald Cotton case*

In *Brathwaite*, the United States Supreme Court had to decide whether an eyewitness identification should be suppressed if the identification procedure was unnecessarily suggestive. As this Court explained in *Anderson v. State*, 123 P.3d 1110, 1115 (Alaska App.2005), the precise issue confronting the Supreme Court in *Brathwaite* was whether, following an unnecessarily suggestive identification procedure, the witness's identification should be automatically suppressed or whether, instead, the government should be given the opportunity to demonstrate the reliability of the witness's identification despite the undue suggestiveness of the procedure.

In *Brathwaite*, the Supreme Court rejected a rule of *per se* suppression and instead held that the witness's identification would be admissible if the State could demonstrate the reliability of the identification under the "totality of the circumstances".[12] The Supreme Court defined this phrase, "totality of the circumstances", as encompassing the five factors that the Court had set forth in an earlier decision, *Neil v. Biggers:*[13]

**12.** *Brathwaite*, 432 U.S. at 112–14, 97 S.Ct. at 2252–53, citing *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

**13.** 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

- the witness's opportunity to view the perpetrator during the crime,
- the witness's degree of attention,
- the accuracy of any prior description given by the witness,
- the witness's level of certainty when making the identification, and
- the length of time between the crime and the witness's identification.

*Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253 (citing *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382).

With the *Brathwaite* reliability test in mind, we now return to the facts of the Ronald Cotton case.

One of the crucial events in that case occurred after Bobby Poole was finally identified as a suspect in the case and Ronald Cotton was granted a second trial. At that second trial, Poole was summoned to court so that Jennifer Thompson would have the opportunity to view Cotton and Poole together.

As we explained earlier in this opinion, Thompson spent half an hour in Poole's presence during the rape. During that half hour, Thompson consciously paid attention to, and made a point of remembering, Poole's physical features and the nuances of his voice and speech, so that she could be sure to identify him later. Nevertheless, when Thompson saw the two men together in court, she did not recognize Poole as her attacker. Indeed, even though the two men apparently had similar physical features, Thompson did not even experience any uncertainty. She reaffirmed that Cotton was the rapist—and Cotton was convicted again.

Years later, when the DNA test results finally proved Cotton's innocence, Detective Gauldin (the detective who conducted the photo lineup) was the one who went to tell Thompson that Poole was the rapist and that Cotton was innocent. Thompson's reaction was, "No, that can't be true; it's not possible.... I know Ronald Cotton raped me. There's no question in my mind."

Moreover, even after Thompson knew the truth, her memory of the event remained the same: whenever she thought about the rape, or dreamed about it, it was still Cotton's face that she saw.

This last aspect of the case is particularly troubling: the fact that Thompson's false memory of Cotton as her attacker persisted even after Thompson knew (intellectually) that Cotton was innocent and that Poole had committed the rape. This false memory was clearly the result of the identification procedures employed during the investigation—because Thompson was not previously acquainted with Cotton, and because she was in Poole's presence (not Cotton's presence) during the half-hour of the rape. But if the five *Brathwaite* factors are applied to this case, it is obvious that a court would have allowed Thompson to testify and identify Cotton as her assailant—even if the court had found that the photo lineup was unnecessarily suggestive.

Thompson had plenty of opportunity (a half an hour) to view the rapist. And during the attack, she consciously devoted her attention to the rapist, so that she would remember his physical characteristics and voice. Shortly after the rape, when Thompson was interviewed at the hospital, she worked with the police to develop a composite drawing of her attacker—a drawing that resembled Ronald Cotton. And when Thompson was shown the photo lineup three days after the rape, she declared she was certain that Cotton was her attacker.

One might conclude that this is simply a rare and unfortunate instance where application of the *Brathwaite* factors would lead a court to admit evidence of a mistaken identification. But there is another, more troubling conclusion that could be drawn: that the *Brathwaite* factors are inadequate to the task of sorting reliable identifications from unreliable identifications.

A photographic lineup is generally conducted in private between a police investigator and a witness. As Professor Wells notes in the recent article he co-authored with Deah S. Quinlivan concerning the validity of the *Brathwaite* factors, when a police investigator conducts a photographic lineup, the investigator interacts directly with the witness: in effect, they have a conversation

about the photos.[14] If the police investigator knows which photograph represents the person who is under suspicion, there is a danger that the witness's identification will be influenced by the officer's knowledge and expectations, even though, seemingly, there is nothing suggestive about the procedure:

> [When the police investigator knows which photograph is the suspect's photograph, this] creates a situation very similar to one that has been extensively studied by psychological scientists in other contexts in which a tester's knowledge or expectations influence the person being tested in a direction that is consistent with the tester's knowledge or expectations. . . . There is no presumption that these tester effects are the result of intentional efforts by the tester or that the tester is aware of influencing the person being tested. . . . [T]he concern here is with the kinds of influences that are unintentional, natural by-products of the [personal] interaction.

Wells & Quinlivan at 7–8.

Moreover, the *Brathwaite* decision appears to be premised on the assumption that, despite the suggestiveness of an identification procedure, a witness retains a "true" memory of the event which may be independently sufficient to reliably identify the perpetrator—if the witness had an adequate opportunity to observe the perpetrator, if the witness was paying attention, etc. In effect, the five *Brathwaite* factors are the test that a court uses to determine if the witness is relying on this presumed independent memory rather than on the result suggested by the identification procedure.

Indeed, even the dissent in *Brathwaite* subscribes to this notion that a witness retains a "true" memory of the event that exists independent of the suggestive photo lineup or show-up, and that this memory can be retrieved despite the previous suggestive procedure. Justice Marshall, writing in dissent, suggested that "when a prosecuting attorney learns that there has been a suggestive confrontation", the prosecutor can "easily" cure this error by "arrang[ing] another lineup under scrupulously fair conditions." *Brathwaite,* 432 U.S. at 126–27, 97 S.Ct. at 2259.

But as Professors Wells and Quinlivan point out in their article on *Brathwaite,* "the dominant view among psychological scientists [is] that, once an eyewitness has mistakenly identified someone, that [mis-identified] person 'becomes' the witness' memory[,] and the error will simply repeat itself [in subsequent identifications]." [15]

This observation is vividly corroborated by the facts of the Ronald Cotton case. Even when Jennifer Thompson was confronted with Bobby Poole (the real rapist) in court, she had no recollection of him, and she re-affirmed her identification of Ronald Cotton as her attacker. Indeed, this false memory persisted even after Thompson *knew* that the memory was false: she continued to see Ronald Cotton's face when she thought back to the rape even after she learned that the DNA testing had demonstrated Cotton's innocence.

Moreover, even assuming that a "true" memory exists independently of a witness's exposure to a suggestive identification procedure, there is reason to doubt whether the five *Brathwaite* factors are a valid method for judging whether a witness's testimony reflects that independent memory.

For instance, according to the Wells and Quinlivan article, when a witness is asked to estimate how long they were able to observe the perpetrator of a crime, the witness will often grossly over-estimate the amount of time the perpetrator was in their view— especially if the witness was under stress or anxiety at the time they observed the events.[16] Similarly, a witness will often inaccurately minimize the amount of time that

**14.** Gary L. Wells & Deah S. Quinlivan, "Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: Thirty Years Later" [*i.e.,* 30 years after *Brathwaite* ], 33 Law and Human Behavior 1–24 (2009), DOI [Digital Object Identifier] 10.1007/s10979–008–9130–3.

**15.** *Id.* at 9.

**16.** *Id.* at 10.

their view of the perpetrator was blocked by another person or a physical obstruction.[17]

Perhaps more troubling are the results of experiments showing that the comments of a police investigator can alter a witness's perception or memory of how long they were able to view the perpetrator, and how good their view was. In a series of experiments, witnesses were given a poor view of a simulated crime, and then they were shown a photo lineup that did *not* include the culprit.[18] The experiment centered on those witnesses who (mistakenly) identified one of the people in the lineup as having committed the crime. The lineup administrator would tell some of these witnesses, "Good; you identified the suspect in this case", while the administrator would make no suggestive remark to the others.[19]

Later, when all of these witnesses were asked, "How good was the view that you had of the culprit?" and "How well could you make out the details of the culprit's face?", the overwhelming majority of witnesses who heard no confirmatory remark conceded that, even though they had made an identification from the lineup, their view was not very good and they could not easily make out the details of the culprit's face.[20] On the other hand, the witnesses who received a confirmatory remark from the lineup administrator had very different perceptions of their own experience. Even though these witnesses had the same poor view of the crime, about 25 percent of them reported that they had a "good" or "excellent" view of the crime, and 20 percent of them declared that they could easily make out the details of the culprit's face.[21]

The results of these experiments suggest that if the evidence in support of the first *Brathwaite* factor—opportunity to view—is based solely on the self-reporting of the witness, then a court would need to know (and try to take account of) what was said to the witness during the identification procedure. In other words, there is reason to believe that this first *Brathwaite* factor is *not* independent of the suggestive identification procedure.

Similarly, many experiments have shown that when a witness receives a confirmatory suggestive remark following their identification of a person in a lineup, this tends to inflate the witness's own perception of how much attention they were paying to the perpetrator of the crime—the second *Brathwaite* factor.[22]

The third *Brathwaite* factor—the witness's degree of certainty in their identification—is obviously crucial to all stages of a criminal investigation. A witness's certainty (or lack of certainty) may influence whether a person is charged at all, or whether the prosecutor takes the case to trial, and if the case goes to trial, how much weight the jury will give to the witness's testimony.

Of course, life provides many instances of people who are certain about something but who are nevertheless mistaken. The question is: is there a valid correlation between a witness's certainty and the correctness of their identification?

Studies have shown that, among witnesses who make an identification (either correct or mistaken) from a lineup, the statistical correlation between the witness's certainty and the correctness of their identification can be as high as 0.41.[23] (Some studies suggest that the correlation is lower.) To put this figure in perspective, the statistical correlation between height and sex in human beings is considerably higher than 0.4. In other words, these studies suggest that you would have much better success in predicting a person's sex if you knew their height than you would have in predicting the accuracy of a witness's identification if you knew the witness's degree of certainty.[24]

17. *Id.*

18. *Id.*

19. *Id.*

20. *Id.*

21. *Id.*

22. *Id.* at 11.

23. *Id.* at 12.

24. *Id.*

Nevertheless, the fact that there is a positive correlation between a witness's certainty and the accuracy of their identification means that a witness's degree of certainty is *some* indication of the accuracy of their identification.[25]

However, as is the case with *Brathwaite* factors one and two, a lineup administrator's confirmatory remark can have a substantial influence on a witness's degree of certainty. In one study, for example, witnesses who mistakenly identified someone from a lineup were later asked whether they had been "positive" or "nearly positive" when they made their identification. Of the witnesses who did not receive a confirmatory remark from the lineup administrator, only 15 percent reported that they had been "positive" or "nearly positive" when they made their selection from the lineup. However, among the witnesses who received a confirmatory remark following their mistaken identification, 50 percent reported that they had been "positive" or "nearly positive" when they made their selection.[26]

As Professors Wells and Quinlivan observe, one crucial aspect of this experiment is that these witnesses were asked *after the fact* to report on their degree of certainty *at the time they made their identification.*[27] In other words, the lineup administrator's suggestive confirmatory remark was not altering the witness's degree of certainty at the time they made their selection from the lineup. Rather, the confirmatory remark was altering the witness's memory—their *recollection* of their degree of certainty at that earlier time.

This finding has potential importance to a judge's evaluation of a witness's testimony—in particular, the witness's self-report of their degree of certainty—at any pre-trial hearing on the *Brathwaite* factors. It suggests that a witness's self-reported degree of certainty is not necessarily trustworthy.

The fourth *Brathwaite* factor—the "accuracy" of the witness's pre-lineup description of the perpetrator—suggests a logical error. One can not know whether a witness's description of the perpetrator is "accurate" unless one knows who the perpetrator is.

As illustrated by the Ronald Cotton case, the fact that a witness may have accurately described the defendant in advance of the lineup, and then selected the defendant's photograph from the lineup, does not prove guilt unless the witness's recollection of the perpetrator is accurate. To conclude that a witness's pre-lineup description was "accurate" (in the sense of describing the true perpetrator of the crime) simply because the witness's description fits the physical characteristics of the defendant is to assume the very fact that needs to be proved.

Instead of the "accuracy" of a witness's pre-lineup description, the fourth *Brathwaite* factor is more properly concerned with the *consistency* between the witness's pre-lineup description of the perpetrator and the physical characteristics of the person whom the witness later selects in the lineup, as well as the *degree* of this consistency (*i.e.,* the amount of detail in the witness's pre-lineup description, and how much of that detail is consistent with physical characteristics of the person whom the witness selected in the lineup).

This fourth *Brathwaite* factor suffers from an underlying analytical weakness. The probative value of this fourth factor—*i.e.,* the consistency between a witness's pre-lineup description of the culprit and the physical characteristics of the person who is later selected in the lineup—hinges in large measure on the assumption that the composition of the lineup has not been influenced by the witness's pre-lineup description of the culprit. This assumption is often false. It is common for the police to rely on the witness's pre-lineup description when they select which photographs to include in a lineup—because the witness's description is often one of the primary clues that the police rely on when they begin to narrow the field of potential suspects.

Moreover, some studies have shown that when witnesses are confronted with a photo

25. *Id.*

26. *Id.*

27. *Id.*

lineup, they tend to select the person who looks most like their memory of the culprit, even when none of the photos matches their memory exactly.[28] This is apparently what happened in the Ronald Cotton case.

Even though Detective Gauldin did not expressly tell Thompson that the photo lineup contained a photograph of the person whom the police suspected, Thompson made the assumption that her attacker's photograph was among the six photos displayed to her, and she believed that her job was to identify the correct photograph. She later told "60 Minutes" reporter Leslie Stahl, "I . . . remember almost feeling like I was [taking] an SAT [multiple choice] test. You know, where you start narrowing down your choices. You can [immediately] discount A and B, [and then you work on the others]."

What does this mean in terms of *Brathwaite's* fourth factor? Professors Wells and Quinlivan suggest the following hypothetical: The police assemble a photo lineup, and they include a photo of the defendant because the defendant seems to match the witness's description of the perpetrator. The witness views the lineup and identifies the defendant. A judge later rules that the lineup was unnecessarily suggestive because the filler photographs were too dissimilar to the photograph of the defendant. But then, based on the consistency between the witness's pre-lineup description of the culprit and the defendant's physical characteristics, the judge concludes that the witness's identification of the defendant is reliable.[29] One might well question whether courts should indulge in this form of circular reasoning.

*The judicial, legislative, and law enforcement response to this research*

Despite the tension between the *Brathwaite* analysis of reliability and the results of the past three decades' psychological research into the dynamics of eyewitness identification, few courts have conducted a critical re-examination of the *Brathwaite* approach.

The New York Court of Appeals was the first court to reject *Brathwaite* on state constitutional grounds: *People v. Adams*, 53 N.Y.2d 241, 440 N.Y.S.2d 902, 905–07, 423 N.E.2d 379, 383–84 (1981). The New York court concluded that the *Biggers/Brathwaite* approach to assessing the reliability of eyewitness identifications was flawed, and so the New York court instead adopted the *per se* rule of exclusion that the United States Supreme Court rejected in *Brathwaite*. In other words, the New York court ruled that evidence of an eyewitness identification arising from an unnecessarily suggestive police-arranged identification procedure must be suppressed, regardless of the *Brathwaite* factors. However, the New York decision— rendered in 1981—was not based on the nascent scientific research into eyewitness identification; rather, it was based on the New York court's agreement with the *Brathwaite* dissenters that it was simply too risky to try to assess the reliability of an identification made during an unnecessarily suggestive lineup or showup.

Beginning in the early 1990s, courts began to demonstrate awareness of the growing scientific criticism of the *Brathwaite* approach. In *State v. Ramirez*, 817 P.2d 774, 780–81 (Utah 1991), the Utah Supreme Court adopted a modified version of the *Brathwaite* factors. The court's primary aim was to craft factors that "more precisely define[d] the focus of the relevant inquiry", and that expressly recognized the problem of witness suggestibility—a difficulty that has no comparable emphasis in the *Biggers/Brathwaite* factors. *See Ramirez*, 817 P.2d at 781.

*See also State v. Hunt*, 275 Kan. 811, 69 P.3d 571, 576 (2003) (adopting the *Ramirez* formulation of the test for reliability of eyewitness identifications because the *Ramirez* factors "present an approach to the identification issue which heightens . . . the reliability of such identification[s]" and which represents "a refinement in the [*Brathwaite*] analysis").

In *Commonwealth v. Johnson*, 420 Mass. 458, 650 N.E.2d 1257, 1261–65 (1995), the Massachusetts Supreme Court followed the lead of the New York Court of Appeals and rejected the *Brathwaite* reliability analysis in

---

**28.** *Id.* at 13.

**29.** *Id.*

favor of a *per se* rule of exclusion (under the Massachusetts constitution). The Massachusetts court relied in part on the research conducted into eyewitness identification by Professors Gary Wells and Elizabeth Loftus. *See Johnson,* 650 N.E.2d at 1262 n. 9.

The year 2005 appears to have been a turning point of sorts in the judicial recognition of the growing body of research into the psychological dynamics of eyewitness identification. In that year, two state supreme courts issued opinions that contained lengthy citations and discussions of the research literature: *State v. Ledbetter,* 275 Conn. 534, 881 A.2d 290, 311–13 (2005), and *State v. Dubose,* 285 Wis.2d 143, 699 N.W.2d 582, 591–92 (2005). The Connecticut court in *Ledbetter* concluded that the research data was not convincing enough to abandon the *Brathwaite* analysis, but the Wisconsin court in *Dubose* held that an eyewitness identification arising from an unnecessarily suggestive showup must be suppressed, without regard to any *Brathwaite* reliability analysis.

See also *Smith v. Smith,* unpublished, 2003 WL 22290984, *10–14 (S.D.N.Y.2003), a habeas corpus decision which contains a lengthy discussion of the various potential flaws in eyewitness identification testimony. The federal court acknowledged that the current research casts doubt on *Brathwaite,* but the court denied the defendant's petition for habeas corpus relief because the state courts that affirmed the defendant's conviction were not clearly wrong to follow the prevailing *Brathwaite* analysis.

In addition to these few courts that have responded to the psychological research on eyewitness identification, several legislatures and police agencies have enacted new laws or policies based on this research.

In September 2005, the Wisconsin Attorney General issued a "Model Policy and Procedure for Eyewitness Identification".[30] This policy recommended that all police agencies utilize a double-blind, sequential photo lineup procedure.[31] The salient details of this procedure are: (1) the officer conducting the photo lineup does not know who the suspect is, (2) the witness being interviewed is told that the culprit may not be included among the photographs, (3) the photographs are shown to the witness one at a time, rather than in a group, (4) the witness is not told in advance how many photographs they will see, and (5) the witness is asked to rate each photograph separately (*e.g.,* "yes", "no", or "unsure")—thus minimizing the danger that the witness will view the procedure as a "multiple choice" test where their task is to pick the one photo that best matches their memory of the culprit.[32]

In April 2006, the California Commission on the Fair Administration of Justice issued its "Report and Recommendations Regarding Eye Witness Identification Procedures". In this report, the California Commission likewise recommended that all police agencies in the state adopt a double-blind, sequential

---

**30.** This model policy is available at: www.doj.state.wi.us/dles/tns/eyewitnesspublic.pdf

**31.** *Id.* at 3.

**32.** *Id.* at 3 & 8–9. On page 9 of the model policy, the Wisconsin Attorney General recommends that the following instructions be given to each witness before a photo lineup:

In a moment, I am going to show you a series of photos. The person who committed the crime may or may not be included. I do not know whether the person being investigated is included. Even if you identify someone during this procedure, I will continue to show you all the photos in the series.

Keep in mind that things like hair styles, beards, and mustaches can be easily changed and that complexion colors may look slightly different in photographs.

You should not feel you have to make an identification. It is as important to exclude innocent persons as it is to identify the perpetrator.

The photos will be shown to you one at a time and are not in any particular order. Take as much time as you need to look at each one. After each photo, I will ask you "Is this the person you saw [insert description of act here]?" Take your time answering the question. If you answer "Yes," I will then ask you, "In your own words, can you describe how certain you are?"

Because you are involved in an ongoing investigation, in order to prevent damaging the investigation, you should avoid discussing this identification procedure or its results.

Do you understand the way the photo array procedure will be conducted and the other instructions I have given you?

photo lineup procedure.[33]

In October 2008, a series of articles that appeared in the Dallas Morning News highlighted a number of misidentifications (and ensuing wrongful criminal convictions) that resulted from suggestive showups and photo lineups.[34] These articles contained a discussion of the current psychological research regarding eyewitness identification, and they prompted the Dallas Police Department to alter their procedures.

In September 2009, USA Today reported that five other states (Connecticut, Georgia, Maryland, North Carolina, and West Virginia) and several major metropolitan police departments are changing their identification procedures in response to the psychological research and the wealth of information confirming that innocent people are indeed being convicted based on mistaken eyewitness identifications.[35]

In particular, North Carolina has enacted a statute that mandates double-blind, sequential photo lineup procedures. *See* North Carolina Statute 15A–284.52. According to the USA Today article, one of the leading proponents of this revision of North Carolina's lineup procedures was Michael Gauldin—the chief investigator in the Ronald Cotton case.[36]

There can be little doubt that these recent changes in the legal system have been prompted by the confluence of two forces: the increasing amount of psychological research in this area, and the concurrent development of forensic DNA testing. As Professors Gary L. Wells, Amina Memon, and Steven D. Penrod noted in their article,

"Eyewitness Evidence: Improving Its Probative Value", 7 Psychological Science in the Public Interest 45 (2006), the last two decades have seen no major change in how eyewitness identification scientists approach their work; rather, "the advent of forensic DNA testing has changed the way the legal system views eyewitness evidence." [37]

The changing attitude of the legal system is attributable to the fact that "the development of forensic DNA testing in the 1990s [uncovered] definitive cases of the conviction of innocent people in the United States", and that "[e]yewitness identification error was at the heart of the evidence used to convict the vast majority of these innocent people." [38] In other words, DNA testing provided the physical science confirmation of what the psychological scientists had been suggesting for years—and this made the non-scientific world begin to pay close attention.

*A re-examination of the photo lineup in Tegoseak's case*

As we explained earlier in this opinion, Officer Asselin—the lead investigator in this case—knew that Edgar Henry was photograph number 5 in the first array of six photos and that Frank Tegoseak was photograph number 5 in the second array. Asselin first showed the two photographic arrays to Michelle Maestas, but she failed to identify either Edgar Henry or Frank Tegoseak. Thus, when Asselin next showed the photographs to Robert Maestas, Asselin knew that this was his final opportunity to get an identification of either Henry or Tegoseak from an eyewitness.

33. California Commission on the Fair Administration of Justice: Report and Recommendations Regarding Eye Witness Identification Procedures (April 2006), page 5. Available at: www.psychology.iastate.edu/g̃lwells/$1fCalifornia—commission.pdf

34. *See, e.g.,* Steve McGonigle & Jennifer Emily, "18 Dallas County cases overturned by DNA relied heavily on eyewitness testimony", Dallas Morning News, October 10, 2008. Available at: www.dallasnews.com/sharedcontent/dws/dn/dnacases/stories/ 101208dnproDNAlineups.–263c4f5.html# slcgm—comments—anchor
For more information on this series of articles, see:

www.dallasnews.com/sharedcontent/dws/spe/2008/dna

35. Kevin Johnson, "States Change Police Lineups After Wrongful Convictions", USA Today, September 17, 2009. Available at:

www.usatoday.com/news/nation/2009–09–16–police–lineups—N.htm

36. *Id.*

37. *Id.* at 48.

38. *Id.*

As we also explained, when Robert Maestas was shown the first array, he "correctly" identified the photograph of Henry (photograph number 5) as being the original passenger in the Bronco, but Maestas also "incorrectly" identified photographs 1 and 3 of this first array as being the original driver.

Asselin knew that this was "wrong", so he said to Maestas, "Let me try to at least show you [the second array of photographs]; then you can see the entire compilation of photos. So far, you've said [that] 1 and 3 [in the first array] could be the driver." Asselin then showed Maestas the second array of six photographs.

When Judge Wolverton ruled on Tegoseak's motion to suppress Maestas's identification, the judge concluded that Asselin's remark to Maestas was not meant to suggest that Maestas should keep looking at more photos because he had not yet successfully identified the culprit. Rather, Judge Wolverton concluded that Asselin's remark was simply intended to clarify the photo lineup procedure—to remind Maestas that there were two photo arrays, and that Maestas should examine both arrays before he made his final selections.

But as we have explained, for purposes of assessing the suggestiveness of the photo lineup, the crucial aspect of the communication between Asselin and Maestas was not Asselin's intention when he made these remarks; instead, the crucial aspect was the information or the suggestion that Maestas may have drawn from these remarks.

If—as appears likely—Maestas knew or suspected that the photo arrays contained photographs of the two men whom Asselin knew to be the culprits (the two men who had been found in the Bronco), then when Asselin told Maestas to keep looking at more photos even though Maestas had apparently identified both men, Asselin's remark could well have suggested to Maestas that his initial selection was "wrong", and that he had not yet identified the true culprit.

This is not to imply that Asselin was consciously attempting to manipulate Maestas's choice. The suggestiveness of the procedure could have been inadvertent on Asselin's part—but real, nonetheless.

The potential suggestiveness of Asselin's remark could only have been amplified later, when Maestas viewed the second array and told Asselin that the original driver of the Bronco was either photograph 1 in the first array (a filler) or photograph 5 in the second array (Tegoseak). Rather than have Maestas place an "X" in the two boxes representing these two photos, Asselin directed Maestas to place an "X" in only one box, the box representing Tegoseak's photo—although Asselin invited Maestas to add a written notation explaining that Maestas thought that the other photo might also be the driver.

Asselin's reaction to Maestas's ambiguous identification was not necessarily an attempt to manipulate Maestas. Rather, it might be attributed to the phenomenon of "observer bias". Both scientific researchers and police investigators can fall prey to the normal human tendency to pay attention to, or to overemphasize, the results that they expect or hope to see—and the converse tendency to fail to observe, or to ignore the significance of, results they do not expect or hope to see.

But while Asselin may not have intended to manipulate Maestas, his directions to Maestas may have affected Maestas's perception of the identification procedure. Asselin's directions to Maestas potentially constituted an inadvertent suggestion that photograph number 5 in the second array (*i.e.*, Tegoseak) was Maestas's "real" selection, and that photograph number 1 in the first array was only a subsidiary alternative selection.

As we explained earlier in this opinion, one of the important findings of the psychological research in this area is that, if a witness makes an identification during a suggestive lineup procedure and then the witness receives some kind of confirmation from the officer administering the lineup, the witness's after-the-fact perception of their identification can be altered: the witness can become artificially more confident in their identification. There is reason to believe that this is what happened to Robert Maestas.

At the evidentiary hearing on Tegoseak's motion to suppress, Maestas readily admitted that he had selected two photos from the lineup as "look[ing] similar to" the man who was the original driver of the Bronco—"both [number] 5 on [the second array] and number 1 on [the first array]". When Maestas was asked whether his identification was "positive", Maestas conceded that it was not.

But by the time of Tegoseak's trial ten weeks later, Maestas viewed the matter differently. When Maestas was questioned about the photo lineup at trial, he now declared that, even though he had initially wavered between photograph 1 in the first array (a filler) and photograph 5 in the second array (Tegoseak), he soon perceived that Tegoseak was the man he had seen in the Bronco.

Here is Maestas's testimony on direct examination:

*Prosecutor:* And [with regard to] Photo Lineup B, were you able to make an identification [from that array]?

*Maestas:* I was.... [Photograph] number 5 ... was the original driver.

*Prosecutor:* And when you were asked to make the identification, did you hesitate somewhat between [photograph] 5 [in the second array] and [photograph] 1 [in the first array]?

*Maestas:* I did; I did. But then I had recalled the way that the gentleman's ears kind of stuck out, after the fact.

*Prosecutor:* Okay. And when you say "the gentleman"—that's [photograph] number 5?

*Maestas:* ... Five. Uh-huh. [affirmative]

And here is Maestas's testimony on redirect examination:

*Prosecutor:* You said [with regard to] the first photo lineup [that] you weren't 100 percent sure. Did you become more sure as you looked at those photos?

*Maestas:* I—I became more sure when I recollected, like I said, what I really distinctly remember was the way the ears stuck out from the head, [from the] side of the head.

*Prosecutor:* Okay.

*Maestas:* That's why I was able to make my determination a little easier.

*Prosecutor:* And that's how you selected [photograph] number 5 [in the second array]?

*Maestas:* Yes.

Maestas said nothing about the distinctiveness of Tegoseak's ears during the photo lineup procedure itself, nor did he say anything about this physical feature when he testified at the suppression hearing. Rather, as Maestas himself admitted, "[he] became more sure when [he] recollected". By the time of Tegoseak's trial, Maestas "distinctly remember[ed] ... the way the ears stuck out from ... the side of [Tegoseak's] head", and he declared that he was able to identify Tegoseak's photo based on this physical feature. This is arguably an example of the kind of altered memory and altered certainty described in the research literature.

*Why we conclude that the potential suggestiveness of the photo lineup is harmless beyond a reasonable doubt*

We have covered a lot of ground in this opinion: a lengthy discussion of the Ronald Cotton case, a look at some of the scientific research on the subject of eyewitness identification, and a description of the recent efforts in various states and cities to improve eyewitness identification procedures. All of this naturally leads to the question: What, if anything, should this Court do in response to what society has learned in the thirty years since *Brathwaite?*

We first wish to clarify that the Ronald Cotton case is simply one case, albeit a prominent one. What happened in that case may provide reason to question the *Brathwaite* analysis, but it does not constitute scientific proof that the *Brathwaite* analysis is flawed.

Second, we acknowledge that our examination of the past three decades' research has not been an exhaustive one. There are many studies in this area that we have not mentioned. And, of course, there are questions in the scientific community about the methodology of particular studies, as well as questions regarding the significance that should

be attributed to the results of various studies.

We do not intend to endorse a particular viewpoint or reach a definitive conclusion at this time. Rather, our goals are more modest: to acknowledge that psychological research into eyewitness identification has furnished new insights into the potential suggestiveness of identification procedures, and to point out that this research has illuminated the related problem that a suggestive identification procedure can work an after-the-fact alteration of a witness's memory of a criminal episode.

 We need go no further at the present time—because, even assuming that the photo lineup procedure in Tegoseak's case was unnecessarily suggestive, any error was harmless beyond a reasonable doubt.[39]

When Judge Wolverton ruled on Tegoseak's suppression motion, he noted that "this might [have been] a different situation if [Tegoseak and Henry] had not been followed and almost [handed]-off to the police." As Judge Wolverton correctly pointed out, the case against Tegoseak was not a "whodunit"—not a case where the police knew that a crime had been committed but did not know the identity of the perpetrator. Rather, the State's evidence clearly established (1) that the Bronco was being driven in an erratic manner, (2) that two men—one wearing a white shirt and one wearing a black shirt—got out of the Bronco in the nursery parking lot and switched places before getting back in the vehicle and driving off, (3) that only two men were in the Bronco when the police stopped the vehicle minutes later—one wearing a white shirt and one wearing a black shirt, and (4) that, following the stop, both men initially admitted to having just driven the car. In addition, Officer Asselin testified that Edgar Henry told the police that he had taken over driving the Bronco after the stop at Bell's Nursery because Tegoseak had been driving so poorly

that he thought Tegoseak was going to kill them.

Given all of this, we have no doubt that the jury would have convicted Tegoseak even if Maestas had been unable to identify Tegoseak at trial, and even if the jurors had been told that Maestas was unable to identify the driver in the photo lineup, or that Maestas had identified one of the filler photos as being the driver. In other words, even if the superior court should have granted Tegoseak's motion to suppress Robert Maestas's identification of him as the initial driver of the Bronco, any error was harmless beyond a reasonable doubt.

*Conclusion*

The judgement of the superior court is AFFIRMED.

BOLGER, Judge, concurring.

The research cited in the lead opinion suggests that we should consider changes to the test we currently use to determine whether a photo lineup procedure satisfies due process of law. But I choose to withhold my opinion on this issue until both parties have the opportunity to submit their positions on the relevant research either through an evidentiary hearing or adversarial briefing. This occasion will more likely arise in a case where the research is essential to the outcome. In the present case, I agree with the conclusion of the lead opinion: Any error in the photo lineup procedure was harmless beyond a reasonable doubt.

---

**39.** Constitutional error requires reversal of a criminal conviction unless the error is shown to be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Raphael v. State*, 994 P.2d 1004, 1010 (Alaska 2000). In assessing whether an error is harmless beyond a reasonable doubt, "the question is whether there is a reasonable possibility that the error affected the result." *Dailey v. State*, 65 P.3d 891, 896 (Alaska App.2003), citing *Smithart v. State*, 988 P.2d 583, 589 (Alaska 1999).